CITY OF CINCINNATI *v.* DISCOVERY NETWORK,
INC., ET AL.

No. 91–1200.   Argued November 9, 1992—Decided March 24, 1993

STEVENS, J., delivered the opinion of the Court, in which BLACKMUN, O'CONNOR, SCALIA, KENNEDY, and SOUTER, JJ., joined. BLACKMUN, J., filed a concurring opinion, *post*, p. 431. REHNQUIST, C. J., filed a dissenting opinion, in which WHITE and THOMAS, JJ., joined, *post*, p. 438.

*Mark S. Yurick* argued the cause for petitioner. With him on the briefs was *Fay D. Dupuis*.

*Marc D. Mezibov* argued the cause for respondents. With him on the brief was *Martha K. Landesberg*.*

*Richard Ruda, Michael G. Dzialo*, and *Peter Buscemi* filed a brief for the U. S. Conference of Mayors et al. as *amici curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed for the American Advertising Federation et al. by *Richard E. Wiley, Lawrence W. Secrest III, Howard H. Bell, John F. Kamp, David S. Versfelt, Robert J. Levering*, and *Valerie Schulte;* for the Association of National Advertisers, Inc., et al. by *Burt Neuborne, Gilbert H. Weil, Randolph Z. Volkell, John F. Kamp, David Versfelt, Jan S. Amundson, Quentin Riegel*, and *Edward Dunkelberger;* for the Institute for Justice by *William H. Mellor III* and *Clint Bolick;* for the Learning Resources Network by *Bruce R.*

Justice Stevens delivered the opinion of the Court.

Motivated by its interest in the safety and attractive appearance of its streets and sidewalks, the city of Cincinnati has refused to allow respondents to distribute their commercial publications through freestanding newsracks located on public property. The question presented is whether this refusal is consistent with the First Amendment.[1] In agreement with the District Court and the Court of Appeals, we hold that it is not.

I

Respondent Discovery Network, Inc., is engaged in the business of providing adult educational, recreational, and social programs to individuals in the Cincinnati area. It advertises those programs in a free magazine that it publishes nine times a year. Although these magazines consist primarily of promotional material pertaining to Discovery's courses, they also include some information about current events of general interest. Approximately one-third of these magazines are distributed through the 38 newsracks that the city authorized Discovery to place on public property in 1989.

Respondent Harmon Publishing Company, Inc., publishes and distributes a free magazine that advertises real˜estate for sale at various locations throughout the United States. The magazine contains listings and photographs of available

Stewart; and for the Washington Legal Foundation by *Charles Fried, Richard Willard, Daniel J. Popeo,* and *Richard A. Samp.*

Briefs of *amici curiae* were filed for the City of New York by *O. Peter Sherwood, Leonard Koerner,* and *Paul T. Rephen;* and for the American Newspaper Publishers Association et al. by *P. Cameron DeVore, Marshall J. Nelson, John F. Sturm, René Milam, Harold W. Fuson, Jr., David M. Olive, Richard J. Tofel, Barbara W. Wall,* and *Peter Stone.*

[1] The First Amendment provides, in part: "Congress shall make no law . . . abridging the freedom of speech, or of the press . . . ." The Due Process Clause of the Fourteenth Amendment has been construed to make this prohibition applicable to state action. See, *e. g., Stromberg* v. *California,* 283 U. S. 359 (1931); *Lovell* v. *Griffin,* 303 U. S. 444 (1938).

residential properties in the greater Cincinnati area, and also includes some information about interest rates, market trends, and other real estate matters. In 1989, Harmon received the city's permission to install 24 newsracks at approved locations. About 15% of its distribution in the Cincinnati area is through those devices.

In March 1990, the city's Director of Public Works notified each of the respondents that its permit to use dispensing devices on public property was revoked, and ordered the newsracks removed within 30 days. Each notice explained that respondent's publication was a "commercial handbill" within the meaning of § 714–1–C of the Municipal Code[2] and therefore § 714–23 of the code[3] prohibited its distribution on public property. Respondents were granted administrative hearings and review by the Sidewalk Appeals Committee. Although the Committee did not modify the city's position,

---

[2] That section provides:

" 'Commercial Handbill' shall mean any printed or written matter, dodger, circular, leaflet, pamphlet, paper, booklet or any other printed or otherwise reproduced original or copies of any matter of literature:

"(a) Which advertises for sale any merchandise, product, commodity or thing; or

"(b) Which directs attention to any business or mercantile or commercial establishment, or other activity, for the purpose of directly promoting the interest thereof by sales; or

"(c) Which directs attention to or advertises any meeting, theatrical performance, exhibition or event of any kind for which an admission fee is charged for the purpose of private gain or profit." Cincinnati Municipal Code § 714–1–C (1992).

[3] That section provides:

"No person shall throw or deposit any commercial or non-commercial handbill in or upon any sidewalk, street or other public place within the city. Nor shall any person hand out or distribute or sell any commercial handbill in any public place. Provided, however, that it shall not be unlawful on any sidewalk, street or other public place within the city for any person to hand out or distribute, without charge to the receiver thereof, any non-commercial handbill to any person willing to accept it, except within or around the city hall building." § 714–23.

it agreed to allow the dispensing devices to remain in place pending a judicial determination of the constitutionality of its prohibition. Respondents then commenced this litigation in the United States District Court for the Southern District of Ohio.

After an evidentiary hearing the District Court concluded that "the regulatory scheme advanced by the City of Cincinnati completely prohibiting the distribution of commercial handbills on the public right of way violates the First Amendment."[4] The court found that both publications were "commercial speech" entitled to First Amendment protection because they concerned lawful activity and were not misleading. While it recognized that a city "may regulate publication dispensing devices pursuant to its substantial interest in promoting safety and esthetics on or about the public right of way,"[5] the District Court held, relying on *Board of Trustees of State University of N. Y. v. Fox,* 492 U. S. 469 (1989), that the city had the burden of establishing "a reasonable 'fit' between the legislature's ends and the means chosen to accomplish those ends." App. to Pet. for Cert. 23a. (quoting *Fox,* 492 U. S., at 480). It explained that the "fit" in this case was unreasonable because the number of newsracks dispensing commercial handbills was "minute" compared with the total number (1,500–2,000) on the public right of way, and because they affected public safety in only a minimal way. Moreover, the practices in other communities indicated that the city's safety and esthetic interests could be adequately protected "by regulating the size, shape, number or placement of such devices." App. to Pet. for Cert. 24a.[6]

---

[4] App. to Pet. for Cert. 25a.

[5] *Id.,* at 23a.

[6] "Such regulation," the District Court noted, "allows [a] city to control the visual effect of the devices and to keep them from interfering with public safety without completely prohibiting the speech in question." *Id.,* at 24a.

On appeal, the city argued that since a number of courts had held that a complete ban on the use of newsracks dispensing traditional newspapers would be unconstitutional,[7] and that the "Constitution . . . accords a lesser protection to commercial speech than to other constitutionally guaranteed expression," *Central Hudson Gas & Electric Corp.* v. *Public Serv. Comm'n of N. Y.*, 447 U. S. 557, 563 (1980), its preferential treatment of newspapers over commercial publications was a permissible method of serving its legitimate interest in ensuring safe streets and regulating visual blight.[8] The Court of Appeals disagreed, holding that the lesser status of commercial speech is relevant only when its regulation was designed either to prevent false or misleading advertising, or to alleviate distinctive adverse effects of the specific speech at issue. Because Cincinnati sought to regulate only the "manner" in which respondents' publications were distributed, as opposed to their content or any harm caused by their content, the court reasoned that respondents' publications had "high value" for purposes of the *Fox* "reasonable fit" test. 946 F. 2d 464, 471 (CA6 1991) (italics omitted). Applying that test, the Court of Appeals agreed with the District Court that the burden placed on speech "cannot be justified by the paltry gains in safety and beauty achieved by the ordinance." *Ibid.*[9] The importance of the Court of

[7] See *Sentinel Communications Co.* v. *Watts*, 936 F. 2d 1189, 1196–1197 (CA11 1991), and cases cited therein.

[8] In the words of the Court of Appeals:

"This 'lesser protection' afforded commercial speech is crucial to Cincinnati's argument on appeal. Cincinnati argues that placing the entire burden of achieving its goal of safer streets and a more harmonious landscape on commercial speech is justified by this lesser protection." 946 F. 2d 464, 469 (CA6 1991). See also *id.*, at 471 ("The [city's] defense of that ordinance rests solely on the low value allegedly accorded to commercial speech in general").

[9] The Court of Appeals also noted that the general ban on the distribution of handbills had been on the books long before the newsrack problem arose. *Id.*, at 473.

Appeals decision, together with the dramatic growth in the use of newsracks throughout the country,[10] prompted our grant of certiorari.  503 U. S. 918 (1992).

## II

There is no claim in this case that there is anything unlawful or misleading about the contents of respondents' publications.  Moreover, respondents do not challenge their characterization as "commercial speech."  Nor do respondents question the substantiality of the city's interest in safety and esthetics.  It was, therefore, proper for the District Court and the Court of Appeals to judge the validity of the city's prohibition under the standards we set forth in *Central Hudson* and *Fox*.[11]  It was the city's burden to establish a "reasonable fit" between its legitimate interests in safety and esthetics and its choice of a limited and selective prohibition of newsracks as the means chosen to serve those interests.[12]

---

[10] We are advised that almost half of the single copy sales of newspapers are now distributed through newsracks.  See Brief for American Newspaper Publishers Association et al. as *Amici Curiae* 2.

[11] While the Court of Appeals ultimately applied the standards set forth in *Central Hudson* and *Fox*, its analysis at least suggested that those standards might not apply to the type of regulation at issue in this case. For if commercial speech is entitled to "lesser protection" only when the regulation is aimed at either the content of the speech or the particular adverse effects stemming from that content, it would seem to follow that a regulation that is not so directed should be evaluated under the standards applicable to regulations on fully protected speech, not the more lenient standards by which we judge regulations on commercial speech.  Because we conclude that Cincinnati's ban on commercial newsracks cannot withstand scrutiny under *Central Hudson* and *Fox*, we need not decide whether that policy should be subjected to more exacting review.

[12] As we stated in *Fox:*

"[W]hile we have insisted that the free flow of commercial information is valuable enough to justify imposing on would-be regulators the costs of distinguishing . . . the harmless from the harmful, we have not gone so far as to impose upon them the burden of demonstrating that the distinguishment is 100% complete, or that the manner of restriction is absolutely the least severe that will achieve the desired end.  What our

There is ample support in the record for the conclusion that the city did not "establish the reasonable fit we require." *Fox*, 492 U. S., at 480. The ordinance on which it relied was an outdated prohibition against the distribution of any commercial handbills on public property. It was enacted long before any concern about newsracks developed. Its apparent purpose was to prevent the kind of visual blight caused by littering, rather than any harm associated with permanent, freestanding dispensing devices. The fact that the city failed to address its recently developed concern about newsracks by regulating their size, shape, appearance, or number indicates that it has not "carefully calculated" the costs and benefits associated with the burden on speech imposed by its prohibition.[18] The benefit to be de-

---

decisions require is a 'fit' between the legislature's ends and the means chosen to accomplish those ends—a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is in proportion to the interest served; that employs not necessarily the least restrictive means but, as we have put it in the other contexts discussed above, a means narrowly tailored to achieve the desired objective. Within those bounds we leave it to governmental decisionmakers to judge what manner of regulation may best be employed.... "Here we require the government goal to be substantial, and the cost to be carefully calculated. Moreover, since the State bears the burden of justifying its restrictions, it must affirmatively establish the reasonable fit we require." 492 U. S., at 480 (internal quotation marks and citations omitted).

[18] We reject the city's argument that the lower courts' and our consideration of alternative, less drastic measures by which the city could effectuate its interests in safety and esthetics somehow violates *Fox*'s holding that regulations on commercial speech are not subject to "least-restrictive-means" analysis. To repeat, see n. 12, *supra*, while we have rejected the "least-restrictive-means" test for judging restrictions on commercial speech, so too have we rejected mere rational-basis review. A regulation need not be "absolutely the least severe that will achieve the desired end," *Fox*, 492 U. S., at 480, but if there are numerous and obvious less-burdensome alternatives to the restriction on commercial speech, that is certainly a relevant consideration in determining whether the "fit" between ends and means is reasonable.

rived from the removal of 62 newsracks while about 1,500–2,000 remain in place was considered "minute" by the District Court and "paltry" by the Court of Appeals. We share their evaluation of the "fit" between the city's goal and its method of achieving it.

In seeking reversal, the city argues that it is wrong to focus attention on the relatively small number of newsracks affected by its prohibition, because the city's central concern is with the overall number of newsracks on its sidewalks, rather than with the unattractive appearance of a handful of dispensing devices. It contends, first, that a categorical prohibition on the use of newsracks to disseminate commercial messages burdens no more speech than is necessary to further its interest in limiting the number of newsracks; and, second, that the prohibition is a valid "time, place, and manner" regulation because it is content neutral and leaves open ample alternative channels of communication. We consider these arguments in turn.

## III

The city argues that there is a close fit between its ban on newsracks dispensing "commercial handbills" and its interests in safety and esthetics because every decrease in the number of such dispensing devices necessarily effects an increase in safety and an improvement in the attractiveness of the cityscape. In the city's view, the prohibition is thus *entirely* related to its legitimate interests in safety and esthetics.

We accept the validity of the city's proposition, but consider it an insufficient justification for the discrimination against respondents' use of newsracks that are no more harmful than the permitted newsracks, and have only a minimal impact on the overall number of newsracks on the city's sidewalks. The major premise supporting the city's argument is the proposition that commercial speech has only a

low value. Based on that premise, the city contends that the fact that assertedly more valuable publications are allowed to use newsracks does not undermine its judgment that its esthetic and safety interests are stronger than the interest in allowing commercial speakers to have similar access to the reading public.

We cannot agree. In our view, the city's argument attaches more importance to the distinction between commercial and noncommercial speech than our cases warrant and seriously underestimates the value of commercial speech.

This very case illustrates the difficulty of drawing bright lines that will clearly cabin commercial speech in a distinct category. For respondents' publications share important characteristics with the publications that the city classifies as "newspapers." Particularly, they are "commercial handbills" within the meaning of § 714–1–C of the city's code because they contain advertising, a feature that apparently also places ordinary newspapers within the same category.[14] Separate provisions in the code specifically authorize the distribution of "newspapers" on the public right of way, but that term is not defined.[15] Presumably, respondents' publications do not qualify as newspapers because an examination of their content discloses a higher ratio of advertising to other text, such as news and feature stories, than is found in the exempted publications.[16] Indeed, Cincinnati's City

---

[14] See n. 2, *supra.*

[15] Cincinnati Municipal Code § 862–1 (1992) provides:

"Permission is hereby granted to any person or persons lawfully authorized to engage in the business of selling newspapers to occupy space on the sidewalks of city streets for selling newspapers, either in the morning or afternoon, where permission has been obtained from the owner or tenant of the adjoining building."

[16] Some ordinary newspapers try to maintain a ratio of 70% advertising to 30% editorial content. See generally C. Fink, Strategic Newspaper Management 43 (1988).

Manager has determined that publications that qualify as newspapers and therefore *can* be distributed by newsrack are those that are published daily and/or weekly and *"primarily* presen[t] coverage of, and commentary on, current events." App. 230 (emphasis added).

The absence of a categorical definition of the difference between "newspapers" and "commercial handbills" in the city's code is also a characteristic of our opinions considering the constitutionality of regulations of commercial speech. Fifty years ago, we concluded that the distribution of a commercial handbill was unprotected by the First Amendment, even though half of its content consisted of political protest. *Valentine* v. *Chrestensen,* 316 U. S. 52 (1942). A few years later, over Justice Black's dissent, we held that the "commercial feature" of door-to-door solicitation of magazine subscriptions was a sufficient reason for denying First Amendment protection to that activity. *Breard* v. *Alexandria,* 341 U. S. 622 (1951). Subsequent opinions, however, recognized that important commercial attributes of various forms of communication do not qualify their entitlement to constitutional protection. Thus, in *Virginia State Bd. of Pharmacy* v. *Virginia Citizens Consumer Council, Inc.,* 425 U. S. 748 (1976), we explained:

> "We begin with several propositions that already are settled or beyond serious dispute. It is clear, for example, that speech does not lose its First Amendment protection because money is spent to project it, as in a paid advertisement of one form or another. *Buckley* v. *Valeo,* 424 U. S. 1, 35–59 (1976); *Pittsburgh Press Co.* v. *Human Relations Comm'n,* 413 U. S., at 384; *New York Times Co.* v. *Sullivan,* 376 U. S., at 266. Speech likewise is protected even though it is carried in a form that is 'sold' for profit, *Smith* v. *California,* 361 U. S. 147, 150 (1959) (books); *Joseph Burstyn, Inc.* v. *Wilson,* 343 U. S. 495, 501 (1952) (motion pictures); *Murdock* v.

*Pennsylvania,* 319 U. S., at 111 (religious literature), and even though it may involve a solicitation to purchase or otherwise pay or contribute money. *New York Times Co.* v. *Sullivan, supra; NAACP* v. *Button,* 371 U. S. 415, 429 (1963); *Jamison* v. *Texas,* 318 U. S., at 417; *Cantwell* v. *Connecticut,* 310 U. S. 296, 306–307 (1940).

"If there is a kind of commercial speech that lacks all First Amendment protection, therefore it must be distinguished by its content. Yet the speech whose content deprives it of protection cannot simply be speech on a commercial subject. No one would contend that our pharmacist may be prevented from being heard on the subject of whether, in general, pharmaceutical prices should be regulated, or their advertisement forbidden. Nor can it be dispositive that a commercial advertisement is noneditorial, and merely reports a fact. Purely factual matter of public interest may claim protection. *Bigelow* v. *Virginia,* 421 U. S., at 822; *Thornhill* v. *Alabama,* 310 U. S. 88, 102 (1940)." *Id.,* at 761–762.

We then held that even speech that does no more than propose a commercial transaction is protected by the First Amendment. *Id.,* at 762.[17]

---

[17] JUSTICE BLACKMUN, writing for the Court in *Bates* v. *State Bar of Arizona,* 433 U. S. 350 (1977), summarized the reasons for extending First Amendment protection to "core" commercial speech:

"The listener's interest [in commercial speech] is substantial: the consumer's concern for the free flow of commercial speech often may be far keener than his concern for urgent political dialogue. Moreover, significant societal interests are served by such speech. Advertising, though entirely commercial, may often carry information of import to significant issues of the day. See *Bigelow* v. *Virginia,* 421 U. S. 809 (1975). And commercial speech serves to inform the public of the availability, nature, and prices of products and services, and thus performs an indispensable role in the allocation of resources in a free enterprise system. See *FTC*

In later opinions we have stated that speech proposing a commercial transaction is entitled to lesser protection than other constitutionally guaranteed expression. See *Ohralik* v. *Ohio State Bar Assn.*, 436 U. S. 447, 455–456 (1978). We have also suggested that such lesser protection was appropriate for a somewhat larger category of commercial speech—"that is, expression related solely to the economic interests of the speaker and its audience." *Central Hudson Gas & Electric Corp.* v. *Public Service Comm'n of New York*, 447 U. S., at 561. We did not, however, use that definition in either *Bolger* v. *Youngs Drug Products Corp.*, 463 U. S. 60 (1983), or in *Board of Trustees of State University of N. Y.* v. *Fox*, 492 U. S. 469 (1989).

In the *Bolger* case we held that a federal statute prohibiting the mailing of unsolicited advertisements for contraceptives could not be applied to the appellee's promotional materials. Most of the appellee's mailings consisted primarily of price and quantity information, and thus fell "within the core notion of commercial speech—'speech which does "no more than propose a commercial transaction."'" *Bolger*, 463 U. S., at 66 (quoting *Virginia Pharmacy*, 425 U. S., at 762, in turn quoting *Pittsburgh Press Co.* v. *Pittsburgh Comm'n on Human Relations*, 413 U. S. 376, 385 (1973)). Relying in part on the appellee's economic motivation, the Court also answered the "closer question" about the proper

---

v. *Procter & Gamble Co.*, 386 U. S. 568, 603–604 (1967) (Harlan, J., concurring). In short, such speech serves individual and societal interests in assuring informed and reliable decisionmaking." *Id.*, at 364.

Of course, we were not the first to recognize the value of commercial speech:

"'[Advertisements] are well calculated to enlarge and enlighten the public mind, and are worthy of being enumerated among the many methods of awakening and maintaining the popular attention, with which more modern times, beyond all preceding example, abound.'" D. Boorstin, The Americans: The Colonial Experience 328, 415 (1958), quoting I. Thomas, History of Printing in America with a Biography of Printers, and an Account of Newspapers (2d ed. 1810).

label for informational pamphlets that were concededly advertisements referring to a specific product, and concluded that they also were "commercial speech." 463 U. S., at 66–67. It is noteworthy that in reaching that conclusion we did not simply apply the broader definition of commercial speech advanced in *Central Hudson*—a definition that obviously would have encompassed the mailings—but rather "examined [them] carefully to ensure that speech deserving of greater constitutional protection is not inadvertently suppressed." 463 U. S., at 66.[18] In *Fox*, we described the category even more narrowly, by characterizing the proposal of a commercial transaction as "*the test* for identifying commercial speech." 492 U. S., at 473–474 (emphasis added).

Under the *Fox* test it is clear that much of the material in ordinary newspapers is commercial speech and, conversely, that the editorial content in respondents' promotional publications is not what we have described as "core" commercial speech. There is no doubt a "commonsense" basis for distinguishing between the two, but under both the city's code and our cases the difference is a matter of degree.[19]

---

[18] When the Court first advanced the broader definition of commercial speech, a similar concern had been expressed. See *Central Hudson*, 447 U. S., at 579 (STEVENS, J., concurring in judgment).

[19] We note that because Cincinnati's regulatory scheme depends on a governmental determination as to whether a particular publication is a "commercial handbill" or a "newspaper," it raises some of the same concerns as the newsrack ordinance struck down in *Lakewood* v. *Plain Dealer Publishing Co.*, 486 U. S. 750 (1988). The ordinance at issue in *Lakewood* vested in the mayor authority to grant or deny a newspaper's application for a newsrack permit, but contained no explicit limit on the scope of the mayor's discretion. The Court struck down the ordinance, reasoning that a licensing scheme that vests such unbridled discretion in a government official may result in either content or viewpoint censorship. *Id.*, at 757, 769–770. Similarly, because the distinction between a "newspaper" and a "commercial handbill" is by no means clear—as noted above, the city deems a "newspaper" as a publication "*primarily* presenting coverage of, and commentary on, current events," App. 230 (emphasis added)—the responsibility for distinguishing between the two carries with

Nevertheless, for the purpose of deciding this case, we assume that all of the speech barred from Cincinnati's sidewalks is what we have labeled "core" commercial speech and that no such speech is found in publications that are allowed to use newsracks. We nonetheless agree with the Court of Appeals that Cincinnati's actions in this case run afoul of the First Amendment. Not only does Cincinnati's categorical ban on commercial newsracks place too much importance on the distinction between commercial and noncommercial speech, but in this case, the distinction bears no relationship *whatsoever* to the particular interests that the city has asserted. It is therefore an impermissible means of responding to the city's admittedly legitimate interests. Cf. *Simon & Schuster, Inc.* v. *Members of N. Y. State Crime Victims Bd.*, 502 U. S. 105, 120 (1991) (distinction drawn by Son of Sam law between income derived from criminal's descriptions of his crime and other sources "has nothing to do with" State's interest in transferring proceeds of crime from criminals to victims); *Carey* v. *Brown*, 447 U. S. 455, 465 (1980) (State's interest in residential privacy cannot sustain statute permitting labor picketing, but prohibiting nonlabor picket-

---

it the potential for invidious discrimination of disfavored subjects. See also *Metromedia, Inc.* v. *San Diego*, 453 U. S. 490, 536–537 (1981) (Brennan, J., concurring in judgment) (ordinance which permits governmental unit to determine, in the first instance, whether speech is commercial or noncommercial "entail[s] a substantial exercise of discretion by a city's official" and therefore "presents a real danger of curtailing noncommercial speech in the guise of regulating commercial speech"). Cf. *Arkansas Writers' Project, Inc.* v. *Ragland*, 481 U. S. 221, 230 (1987) ("In order to determine whether a magazine is subject to sales tax, Arkansas' enforcement authorities must necessarily examine the content of the message that is conveyed .... Such official scrutiny of the content of publications as the basis for imposing a tax is entirely incompatible with the First Amendment's guarantee of freedom of the press") (internal quotation marks and citation omitted).

ing when "nothing in the content-based labor-nonlabor distinction has any bearing whatsoever on privacy").[20]

The city has asserted an interest in esthetics, but respondent publishers' newsracks are no greater an eyesore than the newsracks permitted to remain on Cincinnati's sidewalks. Each newsrack, whether containing "newspapers" or "commercial handbills," is equally unattractive. While there was some testimony in the District Court that commercial publications are distinct from noncommercial publications in their capacity to proliferate, the evidence of such was exceedingly weak, the Court of Appeals discounted it, 946 F. 2d, at 466–467, and n. 3, and Cincinnati does not reassert that particular argument in this Court. As we

---

[20] *Metromedia, Inc.* v. *San Diego*, 453 U. S. 490 (1981), upon which the city heavily relies, is not to the contrary. In that case, a plurality of the Court found as a permissible restriction on commercial speech a city ordinance that, for the most part, banned outdoor "offsite" advertising billboards, but permitted "onsite" advertising signs identifying the owner of the premises and the goods sold or manufactured on the site. *Id.*, at 494, 503. Unlike this case, which involves discrimination between commercial and noncommercial speech, the "offsite-onsite" distinction involved disparate treatment of two types of commercial speech. Only the onsite signs served both the commercial and public interest in guiding potential visitors to their intended destinations; moreover, the plurality concluded that a "city may believe that offsite advertising, with its periodically changing content, presents a more acute problem than does onsite advertising," *id.*, at 511–512. Neither of these bases has any application to the disparate treatment of newsracks in this case.

THE CHIEF JUSTICE is correct that seven Justices in the *Metromedia* case were of the view that San Diego could completely ban offsite commercial billboards for reasons unrelated to the content of those billboards. *Post*, at 444. Those seven Justices did not say, however, that San Diego could *distinguish* between commercial and noncommercial offsite billboards that cause the same esthetic and safety concerns. That question was not presented in *Metromedia*, for the regulation at issue in that case did not draw a distinction between commercial and noncommercial offsite billboards; with a few exceptions, it essentially banned *all* offsite billboards.

have explained, the city's primary concern, as argued to us, is with the aggregate number of newsracks on its streets. On that score, however, all newsracks, regardless of whether they contain commercial or noncommercial publications, are equally at fault. In fact, the newspapers are arguably the greater culprit because of their superior number.

Cincinnati has not asserted an interest in preventing commercial harms by regulating the information distributed by respondent publishers' newsracks, which is, of course, the typical reason why commercial speech can be subject to greater governmental regulation than noncommercial speech. See, e. g., *Bolger*, 463 U. S., at 81 (STEVENS, J., concurring in judgment) ("[T]he commercial aspects of a message may provide a justification for regulation that is not present when the communication has no commercial character"); *Ohralik* v. *Ohio State Bar Assn.*, 436 U. S., at 455–456 (commercial speech, unlike other varieties of speech, "occurs in an area traditionally subject to government regulation").[21]

A closer examination of one of the cases we have mentioned, *Bolger* v. *Youngs Drug Products*, demonstrates the fallacy of the city's argument that a reasonable fit is established by the mere fact that the entire burden imposed on commercial speech by its newsrack policy may in some small way limit the total number of newsracks on Cincinnati's sidewalks. Here, the city contends that safety concerns and visual blight may be addressed by a prohibition that distin-

---

[21] Moreover, the principal reason for drawing a distinction between commercial and noncommercial speech has little, if any, application to a regulation of their distribution practices. As we explained in *Bolger:* "Advertisers should not be permitted to immunize false or misleading product information from government regulation simply by including references to public issues." 463 U. S., at 68. The interest in preventing commercial harms justifies more intensive regulation of commercial speech than noncommercial speech even when they are intermingled in the same publications. On the other hand, the interest in protecting the free flow of information and ideas is still present when such expression is found in a commercial context.

guishes between commercial and noncommercial publications that are equally responsible for those problems. In *Bolger*, however, in rejecting the Government's reliance on its interest in protecting the public from "offensive" speech, "[we] specifically declined to recognize a distinction between commercial and noncommercial speech that would render this interest a sufficient justification for a prohibition of commercial speech." 463 U. S., at 71–72 (citing *Carey* v. *Population Services International*, 431 U. S. 678, 701, n. 28 (1977)). Moreover, the fact that the regulation "provide[d] only the most limited incremental support for the interest asserted," 463 U. S., at 73—that it achieved only a "marginal degree of protection," *ibid.*, for that interest—supported our holding that the prohibition was invalid. Finally, in *Bolger*, as in this case, the burden on commercial speech was imposed by denying the speaker access to one method of distribution— there the United States mails, and here the placement of newsracks on public property—without interfering with alternative means of access to the audience. As then-JUSTICE REHNQUIST explained in his separate opinion, that fact did not minimize the significance of the burden:

> "[T]he Postal Service argues that Youngs can communicate with the public otherwise than through the mail. [This argument falls] wide of the mark. A prohibition on the use of the mails is a significant restriction of First Amendment rights. We have noted that ' "[t]he United States may give up the Post Office when it sees fit, but while it carries it on the use of the mails is as much a part of free speech as the right to use our tongues." ' *Blount* v. *Rizzi*, 400 U. S., at 416, quoting *Milwaukee Social Democratic Publishing Co.* v. *Burleson*, 255 U. S. 407, 437 (1921) (Holmes, J., dissenting)." *Id.*, at 79–80 (footnote omitted).

In a similar vein, even if we assume, *arguendo*, that the city might entirely prohibit the use of newsracks on public

property, as long as this avenue of communication remains open, these devices continue to play a significant role in the dissemination of protected speech.

In the absence of some basis for distinguishing between "newspapers" and "commercial handbills" that is relevant to an interest asserted by the city, we are unwilling to recognize Cincinnati's bare assertion that the "low value" of commercial speech is a sufficient justification for its selective and categorical ban on newsracks dispensing "commercial handbills." Our holding, however, is narrow. As should be clear from the above discussion, we do not reach the question whether, given certain facts and under certain circumstances, a community might be able to justify differential treatment of commercial and noncommercial newsracks. We simply hold that on this record Cincinnati has failed to make such a showing. Because the distinction Cincinnati has drawn has absolutely no bearing on the interests it has asserted, we have no difficulty concluding, as did the two courts below, that the city has not established the "fit" between its goals and its chosen means that is required by our opinion in *Fox*. It remains to consider the city's argument that its prohibition is a permissible time, place, and manner regulation.

## IV

The Court has held that government may impose reasonable restrictions on the time, place, or manner of engaging in protected speech provided that they are adequately justified "'without reference to the content of the regulated speech.'" *Ward* v. *Rock Against Racism*, 491 U. S. 781, 791 (1989), quoting *Clark* v. *Community for Creative Non-Violence*, 468 U. S. 288, 293 (1984). Thus, a prohibition against the use of sound trucks emitting "loud and raucous" noise in residential neighborhoods is permissible if it applies equally to music, political speech, and advertising. See gen-

erally *Kovacs* v. *Cooper*, 336 U. S. 77 (1949). The city contends that its regulation of newsracks qualifies as such a restriction because the interests in safety and esthetics that it serves are entirely unrelated to the content of respondents' publications. Thus, the argument goes, the *justification* for the regulation is content neutral.

The argument is unpersuasive because the very basis for the regulation is the difference in content between ordinary newspapers and commercial speech. True, there is no evidence that the city has acted with animus toward the ideas contained within respondents' publications, but just last Term we expressly rejected the argument that "discriminatory . . . treatment is suspect under the First Amendment only when the legislature intends to suppress certain ideas." *Simon & Schuster, Inc.* v. *Members of N. Y. State Crime Victims Bd.*, 502 U. S., at 117. Regardless of the *mens rea* of the city, it has enacted a sweeping ban on the use of newsracks that distribute "commercial handbills," but not "newspapers." Under the city's newsrack policy, whether any particular newsrack falls within the ban is determined by the content of the publication resting inside that newsrack. Thus, by any commonsense understanding of the term, the ban in this case is "content based."

Nor are we persuaded that our statements that the test for whether a regulation is content based turns on the "justification" for the regulation, see, *e. g., Ward*, 491 U. S., at 791; *Clark*, 468 U. S., at 293, compel a different conclusion. We agree with the city that its desire to limit the total number of newsracks is "justified" by its interests in safety and esthetics. The city has not, however, limited the number of newsracks; it has limited (to zero) the number of newsracks *distributing commercial publications*. As we have explained, there is no justification for that particular regulation other than the city's naked assertion that commercial speech has "low value." It is the absence of a neu-

tral justification for its selective ban on newsracks that prevents the city from defending its newsrack policy as content neutral.

By the same reasoning, the city's heavy reliance on *Renton* v. *Playtime Theatres, Inc.*, 475 U. S. 41 (1986), is misplaced. In *Renton*, a city ordinance imposed particular zoning regulations on movie theaters showing adult films. The Court recognized that the ordinance did not fall neatly into the "content-based" or "content-neutral" category in that "the ordinance treats theaters that specialize in adult films differently from other kinds of theaters." *Id.*, at 47. We upheld the regulation, however, largely because it was justified not by an interest in suppressing adult films, but by the city's concern for the "secondary effects" of such theaters on the surrounding neighborhoods. *Id.*, at 47–49. In contrast to the speech at issue in *Renton*, there are no secondary effects attributable to respondent publishers' newsracks that distinguish them from the newsracks Cincinnati permits to remain on its sidewalks.

In sum, the city's newsrack policy is neither content neutral nor, as demonstrated in Part III, *supra*, "narrowly tailored." Thus, regardless of whether or not it leaves open ample alternative channels of communication, it cannot be justified as a legitimate time, place, or manner restriction on protected speech.

Cincinnati has enacted a sweeping ban that bars from its sidewalks a whole class of constitutionally protected speech. As did the District Court and the Court of Appeals, we conclude that Cincinnati has failed to justify that policy. The regulation is not a permissible regulation of commercial speech, for on this record it is clear that the interests that Cincinnati has asserted are unrelated to any distinction between "commercial handbills" and "newspapers." Moreover, because the ban is predicated on the content of the publications distributed by the subject newsracks, it is not a valid time, place, or manner restriction on protected speech.

For these reasons, Cincinnati's categorical ban on the distribution, via newsrack, of "commercial handbills" cannot be squared with the dictates of the First Amendment.

The judgment of the Court of Appeals is

*Affirmed.*

JUSTICE BLACKMUN, concurring.

I agree that Cincinnati's ban on commercial newsracks cannot withstand scrutiny under *Central Hudson Gas & Electric Corp.* v. *Public Serv. Comm'n of N. Y.*, 447 U. S. 557 (1980), and *Board of Trustees of State University of N. Y.* v. *Fox*, 492 U. S. 469 (1989), and I therefore join the Court's opinion. I write separately because I continue to believe that the analysis set forth in *Central Hudson* and refined in *Fox* affords insufficient protection for truthful, noncoercive commercial speech concerning lawful activities. In *Central Hudson*, I expressed the view that "intermediate scrutiny is appropriate for a restraint on commercial speech designed to protect consumers from misleading or coercive speech, or a regulation related to the time, place, or manner of commercial speech," but not for a regulation that suppresses truthful commercial speech to serve some other government purpose. 447 U. S., at 573 (opinion concurring in judgment). The present case demonstrates that there is no reason to treat truthful commercial speech as a class that is less "valuable" than noncommercial speech. Respondents' publications, which respectively advertise the availability of residential properties and educational opportunities, are unquestionably "valuable" to those who choose to read them, and Cincinnati's ban on commercial newsracks should be subject to the same scrutiny we would apply to a regulation burdening noncommercial speech.

In *Virginia State Bd. of Pharmacy* v. *Virginia Citizens Consumer Council, Inc.*, 425 U. S. 748 (1976), this Court held that commercial speech "which does 'no more than propose a commercial transaction'" is protected by the First Amendment, *id.*, at 762, quoting *Pittsburgh Press Co.* v. *Pittsburgh*

*Comm'n on Human Relations,* 413 U. S. 376, 385 (1973). In so holding, the Court focused principally on the First Amendment interests of the listener. The Court noted that "the particular consumer's interest in the free flow of commercial information . . . may be as keen, if not keener by far, than his interest in the day's most urgent political debate," 425 U. S., at 763, and that "the free flow of commercial information is indispensable . . . to the proper allocation of resources in a free enterprise system . . . [and] to the formation of intelligent opinions as to how that system ought to be regulated or altered," *id.,* at 765. See also *Bates* v. *State Bar of Arizona,* 433 U. S. 350, 364 (1977).

The Court recognized, however, that government may regulate commercial speech in ways that it may not regulate protected noncommercial speech. See generally *Virginia State Bd. of Pharmacy,* 425 U. S., at 770–772. Government may regulate commercial speech to ensure that it is not false, deceptive, or misleading, *id.,* at 771–772, and to ensure that it is not coercive, *Ohralik* v. *Ohio State Bar Assn.,* 436 U. S. 447, 457 (1978). Government also may prohibit commercial speech proposing unlawful activities. *Pittsburgh Press Co.* v. *Pittsburgh Comm'n on Human Relations,* 413 U. S., at 388. See *Bates* v. *State Bar of Arizona,* 433 U. S., at 384.[1] To permit government regulation on these grounds is consistent with this Court's emphasis on the First Amendment interests of the listener in the commercial speech context. A listener has little interest in receiving false, misleading, or deceptive commercial information. See *id.,* at

---

[1] In the context of noncommercial speech, by contrast, this Court has adopted rules that protect certain false statements of fact and speech advocating illegal activities. See, *e. g., New York Times Co.* v. *Sullivan,* 376 U. S. 254, 279–280 (1964) (liability for false statements regarding public officials may not be imposed without a showing of "actual malice"); *Brandenburg* v. *Ohio,* 395 U. S. 444, 447 (1969) (government may not proscribe advocacy of illegal action "except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action").

383 ("[T]he public and private benefits from commercial speech derive from confidence in its accuracy and reliability"). A listener also has little interest in being coerced into a purchasing decision. See *Ohralik* v. *Ohio State Bar Assn.*, 436 U. S., at 457 ("[I]n-person solicitation may exert pressure and often demands an immediate response, without providing an opportunity for comparison or reflection"). Furthermore, to the extent it exists at all, a listener has only a weak interest in learning about commercial opportunities that the criminal law forbids. In sum, the commercial speech that this Court had permitted government to regulate or proscribe was commercial speech that did not "serv[e] individual and societal interests in assuring informed and reliable decisionmaking." *Bates* v. *State Bar of Arizona*, 433 U. S., at 364.

So the law stood in 1980 when this Court decided *Central Hudson* and held that *all* commercial speech was entitled only to an intermediate level of constitutional protection. The majority in *Central Hudson* reviewed the Court's earlier commercial speech cases and concluded that the Constitution "accords a lesser protection to commercial speech than to other constitutionally guaranteed expression." 447 U. S., at 563. As a descriptive matter, this statement was correct, since our cases had recognized that commercial speech could be regulated on grounds that protected noncommercial speech could not. See n. 1, *supra*. This "lesser protection" did not rest, however, on the fact that commercial speech "is of less constitutional moment than other forms of speech," as the *Central Hudson* majority asserted. 447 U. S., at 563, n. 5.[2] Rather, it reflected the fact that the lis-

---

[2] *Central Hudson*'s conclusion that commercial speech is less valuable than noncommercial speech seems to have its roots in an often-quoted passage from *Ohralik:* "[W]e . . . have afforded commercial speech a limited measure of protection, commensurate with its subordinate position in the scale of First Amendment values, while allowing modes of regulation that might be impermissible in the realm of noncommercial expres-

tener's First Amendment interests, from which the protection of commercial speech largely derives, allow for certain *specific* kinds of government regulation that would not be permitted outside the context of commercial speech.

The *Central Hudson* majority went on to develop a four-part analysis commensurate with the supposed intermediate status of commercial speech. Under that test, a court reviewing restrictions on commercial speech must first determine whether the speech concerns a lawful activity and is not misleading.[3] If the speech does not pass this preliminary threshold, then it is not protected by the First Amendment at all. *Id.*, at 566. If it does pass the preliminary threshold, then the government is required to show (1) that the asserted government interest is "substantial," (2) that the regulation at issue "directly advances" that interest, and (3) that the regulation "is not more extensive than is necessary to serve that interest." *Ibid.* The Court refined this test in *Board of Trustees of State University of N. Y.* v. *Fox,* 492 U. S., at 480, to clarify that a regulation limiting commercial speech can, in fact, be more extensive than is necessary to serve the government's interest as long as it is not unreasonably so. This intermediate level of scrutiny is a far cry from strict scrutiny, under which the government interest must be "compelling" and the regulation "narrowly tailored" to serve that interest. See, *e. g., Austin* v. *Michigan Chamber of Commerce,* 494 U. S. 652, 657 (1990).

In *Central Hudson,* I concurred only in the Court's judgment because I felt the majority's four-part analysis was

---

sion." *Ohralik* v. *Ohio State Bar Assn.*, 436 U. S. 447, 456 (1978). As I explain in the text, however, the "limited measure of protection" our cases had afforded commercial speech reflected the fact that we had allowed "modes of regulation that might be impermissible in the realm of noncommercial expression" and not that we had relegated commercial speech to a "subordinate position in the scale of First Amendment values."

[3] *Central Hudson's* reference to "misleading" speech appears to include speech that is inherently coercive, such as in-person solicitation. See 447 U. S., at 563, citing *Ohralik*, 436 U. S., at 464–465.

"not consistent with our prior cases and [did] not provide adequate protection for truthful, nonmisleading, noncoercive commercial speech." 447 U. S., at 573. I noted: "Permissible restraints on commercial speech have been limited to measures designed to protect consumers from fraudulent, misleading, or coercive sales techniques." *Id.*, at 574. Under the analysis adopted by the *Central Hudson* majority, misleading and coercive commercial speech and commercial speech proposing illegal activities are addressed in the first prong of the four-part test. Yet commercial speech that survives the first prong—*i. e.*, that is not misleading or coercive and that concerns lawful activities—is entitled only to an intermediate level of protection. Furthermore, the "substantial" government interest that *Central Hudson* requires to justify restrictions on commercial speech does not have to be related to protecting against deception or coercion, for *Central Hudson* itself left open the possibility that the government's substantial interest in energy conservation might justify a more narrowly drawn restriction on truthful advertising that promotes energy consumption. See *id.*, at 569–572.

Thus, it is little wonder that when the city of Cincinnati wanted to remove some newsracks from its streets, it chose to eliminate all the *commercial* newsracks first although its reasons had nothing to do with either the deceptiveness of particular commercial publications or the particular characteristics of commercial newsracks themselves. First, Cincinnati could rely on this Court's broad statements that commercial speech "is of less constitutional moment than other forms of speech," *id.*, at 563, n. 5, and occupies a "subordinate position in the scale of First Amendment values," *Ohralik*, 436 U. S., at 456. Second, it knew that under *Central Hudson* its restrictions on commercial speech would be examined with less enthusiasm and with less exacting scrutiny than any restrictions it might impose on other speech. Indeed, it appears that Cincinnati felt it had *no choice* under

this Court's decisions but to burden commercial newsracks more heavily. See Brief for Petitioner 28 ("Cincinnati . . . could run afoul of First Amendment protections afforded noncommercial speech by affording newsrack-type dispensers containing commercial speech like treatment with newsracks containing noncommercial speech").

In this case, *Central Hudson*'s chickens have come home to roost.

The Court wisely rejects Cincinnati's argument that it may single out commercial speech simply because it is "low value" speech, see *ante*, at 428, and on the facts of this case it is unnecessary to do more. The Court expressly reserves the question whether regulations not directed at the content of commercial speech or adverse effects stemming from that content should be evaluated under the standards applicable to regulations of fully protected speech. *Ante*, at 416, n. 11. I believe the Court should answer that question in the affirmative and hold that truthful, noncoercive commercial speech concerning lawful activities is entitled to full First Amendment protection. As I wrote in *Central Hudson*, "intermediate scrutiny is appropriate for a restraint on commercial speech designed to protect consumers from misleading or coercive speech, or a regulation related to the time, place, or manner of commercial speech." 447 U. S., at 573.[4] But none of the "commonsense differences," *Virginia State Bd. of Pharmacy*, 425 U. S., at 771, n. 24, between commercial and other speech "justify relaxed scrutiny of restraints that suppress truthful, nondeceptive, noncoercive commercial speech." *Central Hudson*, 447 U. S., at 578 (opinion concurring in judgment).

---

[4] I made no mention in *Central Hudson* of commercial speech proposing illegal activities, but I do not quarrel with the proposition that government may suppress such speech altogether. See *Pittsburgh Press Co.* v. *Pittsburgh Comm'n on Human Relations*, 413 U. S. 376, 388 (1973). See also *Bates* v. *State Bar of Arizona*, 433 U. S. 350, 384 (1977).

The commercial publications at issue in this case illustrate the absurdity of treating all commercial speech as less valuable than all noncommercial speech. Respondent Harmon Publishing Company, Inc., publishes and distributes a free magazine containing listings and photographs of residential properties. Like the "For Sale" signs this Court, in *Linmark Associates, Inc.* v. *Willingboro*, 431 U. S. 85 (1977), held could not be banned, the information contained in Harmon's publication "bear[s] on one of the most important decisions [individuals] have a right to make: where to live and raise their families." *Id.*, at 96. Respondent Discovery Network, Inc., advertises the availability of adult educational, recreational, and social programs. Our cases have consistently recognized the importance of education to the professional and personal development of the individual. See, *e. g.*, *Brown* v. *Board of Education*, 347 U. S. 483, 493 (1954). The "value" of respondents' commercial speech, at least to those who receive it, certainly exceeds the value of the offensive, though political, slogan displayed on the petitioner's jacket in *Cohen* v. *California*, 403 U. S. 15 (1971).

I think it highly unlikely that according truthful, noncoercive commercial speech the full protection of the First Amendment will erode the level of that protection. See *post*, at 439 (dissenting opinion); *Ohralik* v. *Ohio State Bar Assn.*, 436 U. S., at 456. I have predicted that "the Court will never provide child pornography or cigarette advertising the level of protection customarily granted political speech." See *R. A. V.* v. *St. Paul*, 505 U. S. 377, 415 (1992) (opinion concurring in judgment). Yet I do not believe that protecting truthful advertising will test this Nation's commitment to the First Amendment to any greater extent than protecting offensive political speech. See, *e. g.*, *Texas* v. *Johnson*, 491 U. S. 397 (1989) (flag burning); *National Socialist Party of America* v. *Skokie*, 432 U. S. 43 (1977) (Nazi

march through Jewish neighborhood); *Cohen* v. *California*, 403 U. S. 15 (1971) (profane antiwar slogan). The very fact that government remains free, in my view, to ensure that commercial speech is not deceptive or coercive, to prohibit commercial speech proposing illegal activities, and to impose reasonable time, place, or manner restrictions on commercial speech greatly reduces the risk that protecting truthful commercial speech will dilute the level of First Amendment protection for speech generally.

I am heartened by the Court's decision today to reject the extreme extension of *Central Hudson*'s logic, and I hope the Court ultimately will come to abandon *Central Hudson*'s analysis entirely in favor of one that affords full protection for truthful, noncoercive commercial speech about lawful activities.

CHIEF JUSTICE REHNQUIST, with whom JUSTICE WHITE and JUSTICE THOMAS join, dissenting.

Concerned about the safety and esthetics of its streets and sidewalks, the city of Cincinnati decided to do something about the proliferation of newsracks on its street corners. Pursuant to an existing ordinance prohibiting the distribution of "commercial handbills" on public property, the city ordered respondents Discovery Network, Inc., and Harmon Publishing Company, Inc., to remove their newsracks from its sidewalks within 30 days. Respondents publish and distribute free of charge magazines that consist principally of commercial speech. Together their publications account for 62 of the 1,500–2,000 newsracks that clutter Cincinnati's street corners. Because the city chose to address its newsrack problem by banning only those newsracks that disseminate commercial handbills, rather than regulating all newsracks (including those that disseminate traditional newspapers) alike, the Court holds that its actions violate the First Amendment to the Constitution. I believe this result is inconsistent with prior precedent.

"Our jurisprudence has emphasized that 'commercial speech [enjoys] a limited measure of protection, commensurate with its subordinate position in the scale of First Amendment values,' and is subject to 'modes of regulation that might be impermissible in the realm of noncommercial expression.'" *Board of Trustees of State University of N. Y.* v. *Fox*, 492 U. S. 469, 477 (1989) (quoting *Ohralik* v. *Ohio State Bar Assn.*, 436 U. S. 447, 456 (1978)); see also *Bolger* v. *Youngs Drug Products Corp.*, 463 U. S. 60, 64–65 (1983). We have advanced several reasons for this treatment, among which is that commercial speech is more durable than other types of speech, since it is "the offspring of economic self-interest." *Central Hudson Gas & Electric Corp.* v. *Public Serv. Comm'n of N. Y.*, 447 U. S. 557, 564, n. 6 (1980); *Virginia State Bd. of Pharmacy* v. *Virginia Citizens Consumer Council, Inc.*, 425 U. S. 748, 772, n. 24 (1976). Commercial speech is also "less central to the interests of the First Amendment" than other types of speech, such as political expression. *Dun & Bradstreet, Inc.* v. *Greenmoss Builders, Inc.*, 472 U. S. 749, 758, n. 5 (1985) (opinion of Powell, J.). Finally, there is an inherent danger that conferring equal status upon commercial speech will erode the First Amendment protection accorded noncommercial speech, "simply by a leveling process, of the force of the Amendment's guarantee with respect to the latter kind of speech." *Ohralik, supra,* at 456.

In *Central Hudson,* we set forth the test for analyzing the permissibility of restrictions on commercial speech as follows:

"At the outset, we must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation

> directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest." 447 U. S., at 566.

I agree with the Court that the city's prohibition against respondents' newsracks is properly analyzed under *Central Hudson*, see *ante*, at 416, but differ as to the result this analysis should produce.

As the Court points out, "respondents do not challenge their characterization as 'commercial speech,'" and "[t]here is no claim in this case that there is anything unlawful or misleading about the contents of respondents' publications." *Ibid.* "Nor do respondents question the substantiality of the city's interest in safety and esthetics." *Ibid.* This case turns, then, on the application of the last part of the *Central Hudson* analysis. Although the Court does not say so, there can be no question that Cincinnati's prohibition against respondents' newsracks "directly advances" its safety and esthetic interests because, if enforced, the city's policy will decrease the number of newsracks on its street corners. This leaves the question whether the city's prohibition is "more extensive than necessary" to serve its interests, or, as we elaborated in *Fox*, whether there is a "reasonable fit" between the city's desired ends and the means it has chosen to accomplish those ends. See 492 U. S., at 480. Because the city's "commercial handbill" ordinance was not enacted specifically to address the problems caused by newsracks, and, if enforced, the city's prohibition against respondents' newsracks would result in the removal of only 62 newsracks from its street corners, the Court finds "ample support in the record for the conclusion that the city did not establish [a] reasonable fit." *Ante*, at 417 (internal quotation marks omitted). I disagree.

According to the Court, the city's decision to invoke an existing ordinance "to address its recently developed concern about newsracks" indicates that "it has not 'carefully calculated' the costs and benefits associated with the burden

on speech imposed by its prohibition." *Ibid.* The implication being that, if Cincinnati had studied the problem in greater detail, it would have discovered that it could have accomplished its desired ends by regulating the "size, shape, appearance, or number" of all newsracks, rather than categorically banning only those newsracks that disseminate commercial speech. *Ibid.* Despite its protestations to the contrary, see *ante*, at 417, n. 13, this argument rests on the discredited notion that the availability of "less restrictive means" to accomplish the city's objectives renders its regulation of commercial speech unconstitutional. As we observed in *Fox*, "almost all of the restrictions disallowed under *Central Hudson*'s fourth prong have been substantially excessive, disregarding far less restrictive and more precise means." 492 U. S., at 479 (internal quotation marks omitted). That there may be other—less restrictive—means by which Cincinnati could have gone about addressing its safety and esthetic concerns, then, does not render its prohibition against respondents' newsracks unconstitutional.

Nor does the fact that, if enforced, the city's prohibition would result in the removal of only 62 newsracks from its street corners. The Court attaches significance to the lower courts' findings that any benefit that would be derived from the removal of respondents' newsracks would be "'minute'" or "'paltry.'" *Ante*, at 418. The relevant inquiry, though, is not the degree to which the locality's interests are furthered in a particular case, but rather the relation that the challenged regulation of commercial speech bears to the "overall problem" the locality is seeking to alleviate. *Ward* v. *Rock Against Racism*, 491 U. S. 781, 801 (1989). This follows from our test for reviewing the validity of "time, place, or manner" restrictions on noncommercial speech, which we have said is "substantially similar" to the *Central Hudson* analysis. *Board of Trustees of State University of N. Y.* v. *Fox, supra*, at 477 (internal quotation

marks omitted). Properly viewed, then, the city's prohibition against respondents' newsracks is directly related to its efforts to alleviate the problems caused by newsracks, since every newsrack that is removed from the city's sidewalks marginally enhances the safety of its streets and esthetics of its cityscape. This conclusion is not altered by the fact that the city has chosen to address its problem by banning only those newsracks that disseminate commercial speech, rather than regulating all newsracks alike.

Our commercial speech cases establish that localities may stop short of fully accomplishing their objectives without running afoul of the First Amendment. In *Posadas de Puerto Rico Associates* v. *Tourism Co. of Puerto Rico*, 478 U. S. 328, 342 (1986), where we upheld Puerto Rico's ban on promotional advertising of casino gambling aimed at Puerto Rico residents, we rejected the appellant's argument that the ban was invalid under *Central Hudson* because other types of gambling (e. g., horse racing) were permitted to be advertised to local residents. More to the point, in *Metromedia, Inc.* v. *San Diego*, 453 U. S. 490 (1981) (plurality opinion), where we upheld San Diego's ban of offsite billboard advertising, we rejected the appellants' argument that the ban was invalid under *Central Hudson* because it did not extend to onsite billboard advertising. See 453 U. S., at 511 ("[W]hether onsite advertising is permitted or not, the prohibition of offsite advertising is directly related to the stated objectives of traffic safety and esthetics. This is not altered by the fact that the ordinance is underinclusive because it permits onsite advertising"). See also *City Council of Los Angeles* v. *Taxpayers for Vincent*, 466 U. S. 789, 810–811 (1984) (rejecting the argument that the city's prohibition against the posting of signs on public property could not be justified on esthetic grounds because it did not extend to the posting of signs on private property). Thus, the fact that Cincinnati's regulatory scheme is underin-

clusive does not render its ban on respondents' newsracks unconstitutional.

The Court offers an alternative rationale for invalidating the city's policy: viz., the distinction Cincinnati has drawn (between commercial and noncommercial speech) in deciding which newsracks to regulate "bears no relationship *whatsoever* to the particular interests that the city has asserted." *Ante*, at 424 (emphasis in original). That is, because newsracks that disseminate noncommercial speech have the same physical characteristics as newsracks that disseminate commercial speech, and therefore undermine the city's safety and esthetic interests to the same degree, the city's decision to ban only those newsracks that disseminate commercial speech has nothing to do with its interests in regulating newsracks in the first place. The city does not contend otherwise; instead, it asserts that its policy is grounded in the distinction we have drawn between commercial and noncommercial speech. "In the absence of some basis for distinguishing between 'newspapers' and 'commercial handbills' that is relevant to an interest asserted by the city," however, the Court refuses "to recognize Cincinnati's bare assertion that the 'low value' of commercial speech is a sufficient justification for its selective and categorical ban on newsracks dispensing 'commercial handbills.'" *Ante*, at 428.

Thus, despite the fact that we have consistently distinguished between commercial and noncommercial speech for the purpose of determining whether the regulation of speech is permissible, the Court holds that in attempting to alleviate its newsrack problem Cincinnati may not choose to proceed incrementally by burdening only commercial speech first. Based on the different levels of protection we have accorded commercial and noncommercial speech, we have previously said that localities may not favor commercial over noncommercial speech in addressing similar urban problems, see *Metromedia, Inc. v. San Diego, supra*, at 513 (plurality opinion), but before today we have never even suggested that

the converse holds true. It is not surprising, then, that the Court offers little in the way of precedent supporting its new rule. The cases it does cite involve challenges to the restriction of noncommercial speech in which we have refused to accept distinctions drawn between restricted and nonrestricted speech on the ground that they bore no relationship to the interests asserted for regulating the speech in the first place. See *ante*, at 424–425, citing *Simon & Schuster, Inc.* v. *Members of N. Y. State Crime Victims Bd.*, 502 U. S. 105, 120 (1991); *Carey* v. *Brown*, 447 U. S. 455, 465 (1980). Neither of these cases involved the regulation of commercial speech; nor did they involve a challenge to the permissibility of distinctions drawn between categories of speech that we have accorded different degrees of First Amendment protection.

The Court's reliance on *Bolger* v. *Youngs Drug Products Corp.*, see *ante*, at 426–428, is also misplaced. In that case we said that the Government's interest in "shield[ing] recipients of mail from materials that they are likely to find offensive" was invalid regardless of the type of speech—commercial or noncommercial—involved. See 463 U. S., at 71–72. By contrast, there can be no question here that the city's safety and esthetic interests justify its prohibition against respondents' newsracks. This at least is the teaching of *Metromedia*. There, seven Justices were of the view that San Diego's safety and esthetic interests were sufficient to justify its ban on offsite billboard advertising, even though the city's reason for regulating these billboards had nothing to do with the content of the advertisements they displayed. See 453 U. S., 507–510 (opinion of WHITE, J., joined by Stewart, Marshall, and Powell, JJ.); *id.*, at 552–553 (STEVENS, J., dissenting in part); *id.*, at 559–561, 563 (Burger, C. J., dissenting); *id.*, at 569–570 (REHNQUIST, J., dissenting). Without even attempting to reconcile *Metromedia*, the Court now suggests that commercial speech is only subject to lesser protection when it is being regulated because of its content (or adverse effects stemming therefrom). See *ante*, at 416, n. 11, 425–426,

and n. 21. This holding, I fear, will unduly hamper our cities' efforts to come to grips with the unique problems posed by the dissemination of commercial speech.

If (as I am certain) Cincinnati may regulate newsracks that disseminate commercial speech based on the interests it has asserted, I am at a loss as to why its scheme is unconstitutional because it does not also regulate newsracks that disseminate noncommercial speech. One would have thought that the city, perhaps even following the teachings of our commercial speech jurisprudence, could have decided to place the burden of its regulatory scheme on less protected speech (*i. e.*, commercial handbills) without running afoul of the First Amendment. Today's decision, though, places the city in the position of having to decide between restricting more speech—fully protected speech—and allowing the proliferation of newsracks on its street corners to continue unabated. It scarcely seems logical that the First Amendment compels such a result. In my view, the city may order the removal of *all* newsracks from its public right-of-ways if it so chooses. See *Lakewood* v. *Plain Dealer Publishing Co.*, 486 U. S. 750, 780–781 (1988) (WHITE, J., joined by STEVENS and O'CONNOR, JJ., dissenting). But however it decides to address its newsrack problem, it should be allowed to proceed in the manner and scope it sees fit so long as it does not violate established First Amendment principles, such as the rule against discrimination on the basis of content. "[L]ittle can be gained in the area of constitutional law, and much lost in the process of democratic decisionmaking, by allowing individual judges in city after city to second-guess . . . legislative . . . determinations" on such matters as esthetics. *Metromedia*, 453 U. S., at 570 (REHNQUIST, J., dissenting).

Cincinnati has burdened less speech than necessary to fully accomplish its objective of alleviating the problems caused by the proliferation of newsracks on its street corners. Because I believe the city has established a "reason-

able fit" between its substantial safety and esthetic interests and its prohibition against respondents' newsracks, I would hold that the city's actions are permissible under *Central Hudson*. I see no reason to engage in a "time, place, or manner" analysis of the city's prohibition, which in any event strikes me as duplicative of the *Central Hudson* analysis. Cf. *Board of Trustees of State University of N. Y.* v. *Fox*, 492 U. S., at 477. Nor do I think it necessary or wise, on the record before us, to reach the question whether the city's regulatory scheme vests too much discretion in city officials to determine whether a particular publication constitutes a "commercial handbill." See *ante*, at 423, n. 13. It is undisputed, by the parties at least, that respondents' magazines constitute commercial speech. I dissent.