**PENN ADVERTISING OF BALTIMORE, INC.**

v.

**The MAYOR AND CITY COUNCIL OF the CITY OF BALTIMORE, et al.**

**Civ. No. HM–94–877.**

United States District Court, D. Maryland.

Aug. 11, 1994.

Jeffrey Harris, Eric M. Rubin, Walter E. Diercks, Rubin, Winston, Diercks, Harris & Cooke, Washington, DC, for plaintiff.

Burton H. Levin, Asst. City Sol., and Christopher J. Fritz, Stephen A. Goldberg, Thomas C. Dame, Julie E. Squire, Gallagher, Evelius and Jones, Baltimore, MD, for defendants.

## *MEMORANDUM*

HERBERT F. MURRAY, Senior District Judge.

### I. *INTRODUCTION*

Baltimore City Ordinance 307 (Council Bill No. 627) (hereinafter "Ordinance 307") was signed into law by Mayor Kurt L. Schmoke on March 7, 1994. This Ordinance prohibits cigarette advertising on billboards located in certain designated zones within Baltimore City. Plaintiff Penn Advertising of Baltimore, Inc. (hereinafter "Penn") is the owner of billboards located within these zones of prohibition. By its terms Ordinance 307 was to take effect on the 30th day after the date of its enactment. On the thirtieth day after enactment of Ordinance 307, Penn brought this action against defendants The Mayor and City Council of Baltimore, Kurt L. Schmoke, in his official capacity as Mayor of Baltimore City, and David Tanner, in his official capacity as General Superintendent of Zoning Administration and Enforcement of Baltimore City (hereinafter collectively referred to as "the City"). Penn seeks injunctive and declaratory relief.

In its complaint, Penn states three separate grounds upon which it seeks judgment. Penn first claims that Ordinance 307 is in violation of the First Amendment's protection of free speech. Second, Penn claims that Ordinance 307 is pre-empted by Section 5(b) of the Federal Cigarette Labeling and Advertising Act. Lastly, Penn claims that Ordinance 307 is pre-empted by Maryland State law.

On April 26, 1994, in lieu of filing an answer to Penn's complaint, the City filed a Motion to Dismiss, or in the Alternative, for Summary Judgment.[1] Penn responded by

---

1. Because the Court has considered matters outside of the pleadings, the Court will not rule on

filing a Memorandum in Opposition. After reviewing the parties' memoranda and exhibits, this Court has determined that no hearing is necessary and is prepared to rule on the merits of the City's motion.

## II. *MOTION FOR SUMMARY JUDGMENT*

Rule 56(c) of the Federal Rules of Civil Procedure permits a grant of summary judgment only if no genuine issues of material fact exist and the moving party is entitled to a judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The burden is on the moving party to demonstrate the absence of such issues of material fact. For the purposes of deciding the present motion, this Court must construe all facts and reasonable inferences in favor of the plaintiff. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986).

In opposition to summary judgment, however, a party must proffer more than "a mere scintilla of evidence" to raise a genuine issue of material fact. *Anderson*, 477 U.S. at 252, 106 S.Ct. at 2512. Although not weighing the evidence or determining the truth for the purposes of these motions, the Court must consider "whether reasonable jurors could find by a preponderance of the evidence that [the non-moving party] is entitled to a verdict." *Id.* at 249, 252, 106 S.Ct. at 2510, 2512.

Despite Penn's assertions to the contrary, this Court concludes, after careful review of the pleadings and exhibits, that there is no genuine dispute of material fact in this case, and that the questions presented by plaintiff's Complaint are legal questions ripe for decision by this Court.

■ While Penn asserts that the parties vigorously dispute factual matters, this is not so. The parties vigorously dispute questions of law and it is proper for this Court to decide these questions. There are no factual issues to be decided because this case concerns a facial attack on the legal sufficiency of an ordinance. An example of Penn's mischaracterization of legal issues as factual

ones is Penn's statement that "it should at least be clear . . . that the question of whether Ordinance 307 is a prohibition or requirement based on smoking and health is something about which Plaintiff and Defendants sharply disagree." Plaintiff's Opp. to Def. Motion for Summ. Judg., at 9. While the parties do disagree on this issue, that disagreement is not relevant to the determination of whether summary judgment is appropriate because it concerns a legal question which is properly decided by this Court. Similarly, Penn's memorandum contains lengthy legal arguments in support of each of Penn's claims. At the end of each of these legal arguments, Penn asserts that a dispute of fact is involved. But Penn does not direct this Court to any such factual disputes; rather, Penn simply argues the law. This Court finds that there are no genuine disputes of material fact present in this case. Therefore, the Court will rule on the legal issues presented in the parties' memoranda.

### A. Ordinance 307 is Constitutional

■ While it is true that "the First Amendment, as applied to the states through the Fourteenth Amendment, protects commercial speech from unwarranted governmental regulation," *Central Hudson Gas & Elec. v. Public Serv. Comm'n*, 447 U.S. 557, 561, 100 S.Ct. 2343, 2349, 65 L.Ed.2d 341 (1980) (citing *Virginia Pharmacy Board v. Virginia Citizens Consumer Council*, 425 U.S. 748, 761–762, 96 S.Ct. 1817, 1825–1826, 48 L.Ed.2d 346 (1976)), it is also well-settled that "commercial speech [enjoys] a limited measure of protection commensurate with its subordinate position in the scale of First Amendment values, while allowing modes of regulation that might be impermissible in the realm of noncommercial expression." *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 456, 98 S.Ct. 1912, 1918, 56 L.Ed.2d 444 (1978).

The appropriate test for assessing the constitutionality of restrictions on commercial speech was established by the Supreme Court in *Central Hudson:*

the City's motion to dismiss, but rather on the   *City's alternative motion for summary judgment.*

At the outset, we must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. Next we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest.

*Central Hudson*, 447 U.S. at 566, 100 S.Ct. at 2351 (1980).

In the instant case, the parties agree that the advertising in question is neither unlawful nor misleading, thereby satisfying the first prong of the *Central Hudson* test. The parties vigorously dispute whether the ordinance complies with the second, third and fourth prongs of the test.

### 1. The Second Prong: Substantial government interest

■ In order to satisfy the second prong of the *Central Hudson* test, the City must demonstrate a substantial government interest which the City seeks to achieve by its promulgation of Ordinance 307. The asserted interest of the City, as stated in both its memorandum and in the Preamble to Ordinance 307, is to promote compliance with the state law prohibition against the sale of cigarettes to minors, Md.Ann.Code art. 27, § 404 (1992), thereby also furthering the obvious public policy underlying this prohibition which is to prevent the purchase, and thus the consumption, of cigarettes by minors. This is certainly a sufficiently substantial interest for the purposes of the *Central Hudson* test.

Article 27, § 404 of the Maryland Code declares that "it is unlawful for any person engaged in the manufacture or sale of cigarettes to sell, barter or give cigarettes to any individual under the age of 18 years." Md. Ann.Code art. 27, § 404 (1992). While, as Penn asserts, a minor does not commit an act expressly prohibited by § 404 by purchasing cigarettes, the person selling the cigarettes to a minor is committing an act expressly prohibited by this ordinance. Thus, if the number of minors seeking to purchase cigarettes decreases, the number of transactions in violation of § 404 will also decrease. Ordinance 307 represents a legislative judgment by the Baltimore City Council that a reduction in the exposure of minors to stimuli encouraging the purchase of cigarettes will result in fewer minors seeking to purchase cigarettes and therefore fewer illegal transactions. Furthermore, the public policy behind § 404 of preventing the purchase, and thus the consumption, of cigarettes by minors would be advanced as well.

The City has a substantial interest both in promoting compliance with § 404 and in advancing the public policy which underlies § 404. Therefore, the second prong of the *Central Hudson* test is satisfied.

### 2. The Third Prong: Does Ordinance 307 directly advance this substantial interest?

In *Edenfield v. Fane*, —— U.S. ——, 113 S.Ct. 1792, 123 L.Ed.2d 543 (1993) (holding that a Florida ordinance prohibiting Certified Public Accountants from in-person solicitation was an unconstitutional restraint on free speech), the Supreme Court elaborated upon the third prong of the constitutionality test for restrictions on commercial speech first set forth in *Central Hudson*. The Court stated that to withstand a First Amendment challenge, the state must demonstrate that "its restriction serves a substantial state interest and is designed in a reasonable way to accomplish that end." *Id.* at ——, 113 S.Ct. at 1799. The Court also cautioned that the state's burden

is not satisfied by mere speculation or conjecture; rather a governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real and that its restrictions will in fact alleviate them to a material degree.

*Id.* at ——, 113 S.Ct. at 1800.

The City maintains that the Court's *Edenfield* ruling does not modify the "intermedi-

ate level"[2] of scrutiny that had been applicable to challenges to restraints on commercial speech prior to *Edenfield* and that the same deference should be afforded the legislature that had been prior to *Edenfield*. An example of this judicial deference is found in the deference the Supreme Court has given a legislature's judgment that a link exists between billboards and traffic safety in repeated litigation over the placement of billboards. In *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981), for example, the Court upheld San Diego's ban on off-site billboard advertising under the *Central Hudson* test. Although the record failed to establish a connection between billboards and traffic safety, the Court nonetheless upheld the restriction, stating that "[w]e likewise hesitate to disagree with the accumulated, common sense judgments of local lawmakers and of the many reviewing courts that billboards are real and substantial hazards to traffic safety." *Id.* at 509, 101 S.Ct. at 2893 (footnote omitted).

■ The City urges the Court to defer to the legislative judgment that the connection between advertising and consumption is "self-evident" as the Supreme Court and lower courts had done prior to *Edenfield. See, e.g., Posadas de Puerto Rico Assoc. v. Tourism Co. of Puerto Rico*, 478 U.S. 328, 342, 106 S.Ct. 2968, 2977, 92 L.Ed.2d 266 (1986) ("The Puerto Rico Legislature obviously believed that advertising of casino gambling . . . would serve to increase the demand for the product advertised. We think the legislature's belief is a reasonable one."); *Central Hudson*, 447 U.S. at 569, 100 S.Ct. at 2353 ("There is an immediate connection between advertising and demand for electricity. Central Hudson would not contest the advertising ban unless it believed that promotion would increase its sales."); *Oklahoma Telecasters Ass'n v. Crisp*, 699 F.2d 490 (10th Cir.1983), *rev'd on other grounds sub nom., Capital Cities Cable, Inc. v. Crisp*, 467 U.S. 691, 104 S.Ct. 2694, 81 L.Ed.2d 580 (1984)

(Deferring to a legislative judgment linking alcohol advertising and consumption in upholding a prohibition against the broadcasting of advertisements for alcoholic beverages); *Dunagin v. Oxford*, 718 F.2d 738 (5th Cir.1983), *cert. denied*, 467 U.S. 1259, 104 S.Ct. 3554, 82 L.Ed.2d 855 (1984) ("We hold that sufficient reason exists to believe that advertising and consumption are linked to justify the ban [on local liquor advertising], whether or not 'concrete scientific evidence' exists to that effect.").

Penn asserts that the Supreme Court's opinion in *Edenfield* has altered the level of scrutiny with which the Court is to examine a restraint on commercial speech. According to Penn, the Court should no longer apply an intermediate level of scrutiny. Penn asserts that after *Edenfield*, the City must satisfy "a serious and substantial burden of proof . . . that requires a fact-intensive inquiry that cannot be resolved through summary judgment." Plaintiff's Opp. to Def. Motion for Summ. Judg., at 25. Under this more difficult test, Penn asserts that it is inappropriate for this Court to accept the judicially-recognized proposition that advertising increases consumption as sufficient to sustain the City's burden and thus that it is inappropriate for this Court to grant the City's motion for summary judgment.

Penn raised substantially the same argument in *Anheuser Busch, Inc. and Penn Advertising of Baltimore, Inc. v. Mayor and City Council of Baltimore*, 855 F.Supp. 811 (D.Md.1994) (hereinafter *Penn I*). *Penn I* involved a First Amendment challenge to an ordinance very similar to Ordinance 307, except the ordinance challenged in *Penn I* prohibited alcohol advertising on billboards located in areas that would cause minors to be exposed to such advertising, whereas Ordinance 307 prohibits cigarette advertising on similarly-situated billboards. Judge Hargrove in *Penn I* did not accept the increased level of scrutiny for commercial speech restrictions which Penn asserted makes it inap-

---

**2.** The Court reaffirmed its view that an intermediate level of scrutiny is applicable to First Amendment challenges to restrictions on commercial speech in *Discovery Network* where the Court required a more searching inquiry than rational basis review, but one less rigorous than least restrictive means. *Cincinnati v. Discovery Network, Inc.*, —— U.S. ——, —— n. 13, 113 S.Ct. 1505, 1510 n. 13, 123 L.Ed.2d 99 (1993).

propriate for the Courts to defer to a legislative judgment that advertising increases consumption. Rather, Judge Hargrove concluded that *Edenfield* did not change the requisite level of scrutiny:

> This Court ... is unable to find any language in *Edenfield* that specifies the precise level of scrutiny with which this Court must review the Ordinance. *Edenfield* requires only that the government "demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree."

*Penn I*, 855 F.Supp. at 815 (quoting *Edenfield*, —— U.S. at ——, 113 S.Ct. at 1800). This Court finds Judge Hargrove's analysis persuasive.

In *Penn I*, Judge Hargrove relied on *United States v. Edge Broadcasting Co.*, —— U.S. ——, 113 S.Ct. 2696, 125 L.Ed.2d 345 (1993), a Supreme Court decision that followed soon after the Court's *Edenfield* decision, to support his position. In *Edge*, the Court upheld a federal statute prohibiting radio broadcast of lottery advertising by licensees located in non-lottery states against a First Amendment challenge to restrictions on commercial speech. In doing so, the Court "affirmed the role of judicial deference to legislative judgments in the area of commercial speech." *Penn I*, 855 F.Supp. at 815. The Court acknowledged the propriety of judicial deference to a legislative judgment that advertising increases consumption, stating that

> Within the bounds of the general protection provided by the Constitution to commercial speech, we allow room for legislative judgments. Here, as in *Posadas de Puerto Rico*, the Government obviously legislated on the premise that the advertising of gambling serves to increase the demand for the advertised product. Congress clearly was entitled to determine that broadcast of promotional advertising of lotteries undermines North Carolina's policy against gambling.

*Edge*, —— U.S. at ——, 113 S.Ct. at 2707.

Penn cites *Cal–Almond, Inc. v. United States Dep't of Agric.*, 14 F.3d 429 (9th Cir. 1993) (holding that a governmental program that required individual almond growers to pay assessments for government-sponsored advertising was an unconstitutional restriction on commercial speech), *Coors Co. v. Bentsen*, 2 F.3d 355 (10th Cir.1993) and *Hornell Brewing Co. v. Brady*, 819 F.Supp. 1227 (E.D.N.Y.1993), in support of their assertion that the federal courts that have recently been presented with this issue have refused to follow the judicially-recognized principle that advertising increases consumption. Despite Penn's contentions, none of these cases actually support this proposition.

Judge Hargrove in *Penn I* actually cited *Cal–Almond* in support of the opposing position. In *Cal–Almond*, the Ninth Circuit considered the impact of the recent Supreme Court decisions involving commercial speech on *Central Hudson* and concluded that it was still appropriate to adhere to the judicial recognition that a link exists between advertising and consumption. While acknowledging the Court's general instruction in *Edenfield* to evaluate the government's interests and the harms it seeks to avoid, the Court noted that "the Supreme Court assumes as a matter of law that advertising increases consumption of the product or service being advertised.... Therefore, we may reasonably assume that the Board's promotional efforts have some positive effect on almond demand." *Cal–Almond*, 14 F.3d at 439 (citations omitted).

While the Court went on to complete a more searching inquiry into the success of the Board's advertising efforts, the Court did so because the issue presented was not merely whether the Board's advertising efforts had increased demand. Rather, the relevant issue, whether "the generic Board promotion ... sells almonds more effectively than the specific, targeted marketing efforts of individual handlers," required the Court to "compare it [the increase in demand caused by the Board's promotional campaign] to a situation where handlers spent their assessments on their own marketing." *Id.* at 439.

In *Coors*, the Tenth Circuit held that a regulation prohibiting statements of alcohol content on malt beverage labels violated the First Amendment. The government contended that the purpose of the regulation was to prevent strength wars among compet-

ing manufacturers. In invalidating the regulation, the Court noted that "[t]he critical question is whether the evidence shows the required relationship between the labeling prohibition that Coors is challenging and the threat of strength wars." *Coors*, 2 F.3d at 358. The Court found that

> the Government has offered no evidence to indicate that the appearance of factual statements of alcohol content on malt beverage labels would lead to strength wars.... Instead, it has offered only inferential arguments that are based on mere speculation and conjecture.

*Id.* at 359. Judge Hargrove noted that the link the government sought to establish in *Coors* "is, at best, tenuous." *Penn I*, 855 F.Supp. at 817.

In *Hornell*, the Court held that legislation prohibiting the use of the name "Crazy Horse" on alcoholic products was in violation of the First Amendment's protection of commercial speech because it did not directly advance the government's substantial interest in preventing the enhanced appeal of alcohol use among Native Americans. The government's argument was "based on the premise that the use of the name Crazy Horse will stimulate demand for malt liquor in Native American Communities." *Hornell*, 819 F.Supp. at 1235. While the Court refused to defer to the legislature's judgment and accept the government's premise without evidence to support it, the Court was careful to distinguish *Hornell* from *Posadas*, noting:

> Furthermore, in *Posadas*, the Court was able to defer to the legislature on the basis of precedent ... that established the causal relationship between advertising and consumption.... Here, there is no comparable precedent that suggests, let alone establishes, an immediate connection between the use of one specific Native American name, Crazy Horse, and increased consumption of alcohol by Native Americans. The government asks the Court to make a leap of faith and logic on this point.

*Id.* at 1237.

The situations presented in *Cal–Almond*, *Coors* and *Hornell* differ greatly from the one currently before this Court. In *Cal–Almond*, the government sought to show, not merely that advertising increases consumption, but that "a government agency is better at marketing [almonds] than an individual business person." *Cal–Almond*, 14 F.3d at 439. In *Coors*, the government sought to establish a link between factual statements of alcohol content on malt beverage labels and strength wars. In *Hornell*, the government sought to establish a link between use of the name Crazy Horse and enhanced demand for malt liquor in Native American Communities. In all three cases, the government sought to establish a proposition that was, at best, tenuous. In all three cases the government asked the Court to accept mere speculation and conjecture as sufficient to satisfy their *Central Hudson* burden of demonstrating that the regulation in question directly advanced the asserted substantial governmental interest. In the case currently before this Court, the City urges this Court to accept the proposition that advertising increases consumption. This link is "more immediately apparent," *Penn I*, 855 F.Supp. at 817, and is a long-standing, judicially-recognized proposition. *See, e.g., Posadas*, 478 U.S. at 342, 106 S.Ct. at 2977; *Central Hudson*, 447 U.S. at 569, 100 S.Ct. at 2353; *Oklahoma Telecasters Ass'n v. Crisp*, 699 F.2d 490 (10th Cir.1983), *rev'd on other grounds sub nom., Capital Cities Cable, Inc. v. Crisp*, 467 U.S. 691, 104 S.Ct. 2694, 81 L.Ed.2d 580 (1984); *Dunagin*, 718 F.2d 738; *Edge*, —— U.S. ——, 113 S.Ct. 2696.

Penn also asserts that it is inappropriate to accept the judicially-recognized proposition that advertising increases consumption because the purpose of cigarette advertising is not to increase overall consumption but merely to increase the advertiser's market share of an already established pool of smokers. Penn also raised this argument in *Penn I* as it relates to alcohol. Judge Hargrove did not find Penn's position persuasive and adequately addressed their argument in *Penn I*. His reasoning regarding the market share argument is as applicable to cigarette sales as it is to alcohol sales.

> It is beyond our ability to understand why huge sums of money would be devoted to the promotion of sales of liquor without expected results, or continue without real-

ized results. No doubt competitors want to retain and expand their share of the market, but what business person stops short with competitive comparisons? It is total sales, profits, that pay the advertiser; and dollars go into advertising only if they produce sales. Money talks: it talks to the young and the old about what counts in the marketplace of our society.

*Penn I,* 855 F.Supp. at 818 (quoting *Dunagin,* 718 F.2d at 749).

This Court holds that it remains appropriate in the wake of *Edenfield* to accept the judicially-recognized proposition that advertising increases consumption. Furthermore, if advertising increases consumption among the general population, it is also reasonable to accept the proposition that advertising increases consumption among youths. If anything, this statement may be more applicable to the youthful population than to the adult population due to the impressionable nature of youngsters.

As the Supreme Court reasoned in *Edge,* an opinion in which the Court accepted the legislative judgment that advertising increases consumption,

> If there is an immediate connection between advertising and demand, and the federal regulation decreases advertising, it stands to reason that the policy of decreasing demand for gambling is correspondingly advanced. Accordingly, the government may be said to advance its purpose by substantially reducing lottery advertising.... In our view, the restriction ... directly advances the governmental interest within the meaning of Central Hudson.

*Edge,* —— U.S. at ——, 113 S.Ct. at 2707. Similarly, if there is an immediate connection between advertising and demand among minors, as has already been established, and Ordinance 307 decreases cigarette advertising, as it does, it stands to reason that the demand for cigarettes among minors will decrease. If the demand for cigarettes among minors decreases, the City's policy of preventing transactions which violate § 404 and discouraging the purchase and consumption of cigarettes by minors is advanced. Thus, Ordinance 307 does directly advance the City's asserted substantial interest and

passes the third prong of the *Central Hudson* test.

### 3. The Fourth Prong: Is Ordinance 307 narrowly tailored to serve the City's asserted substantial interest?

In *Board of Trustees v. Fox,* 492 U.S. 469, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989), the Supreme Court explained that the fourth prong of the *Central Hudson* test requires only a reasonable fit between the regulation and the interest it is meant to serve for the challenged regulation to pass constitutional muster:

> What our decisions require is a "fit" between the legislature's ends—a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is in proportion to the interest served; that employs not necessarily the least restrictive means but, ... a means narrowly tailored to achieve the desired objective. Within those bounds we leave it to governmental decisionmakers to judge what manner of regulation may best be employed.

*Fox,* 492 U.S. at 480, 109 S.Ct. at 3035 (internal quotations and citations omitted).

In declining to impose a "least restrictive means" requirement, the Court noted that in doing so it was taking "account of the difficulty of establishing with precision the point at which restrictions become more extensive than their objective requires" and providing "the Legislative and Executive Branches needed leeway in a field (commercial speech) 'traditionally subject to government regulation.'" *Id.* at 481, 109 S.Ct. at 3035 (quoting *Ohralik v. Ohio State Bar Ass'n,* 436 U.S. at 455–56, 98 S.Ct. at 1918–19). In *Penn I,* Judge Hargrove explained that "[a]n intermediate level of scrutiny thus recognizes the latitude that decisionmakers require to address widespread social problems." *Penn I,* 855 F.Supp. at 819.

In *Edenfield,* the Court further elaborated upon why a reasonable fit requirement is appropriate. The Court reasoned:

> Commercial speech ... is linked inextricably with the commercial arrangement that it proposes, ... so the State's interest in

regulating the underlying transaction may give it a concomitant interest in the expression itself.... For this reason, laws restricting commercial speech, unlike laws burdening other forms of protected expression, need only be tailored in a reasonable manner in order to survive First Amendment scrutiny.

*Edenfield,* —— U.S. at ——, 113 S.Ct. at 1798.

▇ Penn asserts, as it did in *Penn I,* that Ordinance 307 is not narrowly tailored to serve the City's substantial interest in preventing the purchase and consumption of cigarettes by minors. Penn argues that Ordinance 307 is underinclusive because it prohibits only a small percentage of total advertisements for the product, leaving many other mediums, such as newspapers, magazines, signs inside stores which sell cigarettes, advertisements on the storefronts of businesses that sell cigarettes and on the inside and outside of MTA busses, unrestricted. Penn cites *City of Cincinnati v. Discovery Network, Inc.,* —— U.S. ——, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993), in support of this contention.

In *Discovery Network,* the Supreme Court invalidated a city ordinance because no reasonable fit existed between the regulation and the city's asserted interest. Motivated by its concern for safety and aesthetics, the city used a pre-existing ordinance, which prohibited distribution of "commercial handbills" on public property, to remove 62 newsracks containing commercial handbills while leaving between 1,500 and 2,000 similar newsracks that contained noncommercial speech untouched. The Court held that there was no reasonable fit because the city offered no legitimate justification for distinguishing between the newsracks that contained commercial speech and those that contained noncommercial speech. As the Court explained,

> the city's primary concern ... is with the aggregate number of newsracks on its streets. On that score, however, all newsracks, regardless of whether they contain commercial or noncommercial publications, are equally at fault.

*Discovery Network,* —— U.S. at ——, 113 S.Ct. at 1514. The only justification the city offered for this differentiation between newsracks was the fact that commercial speech receives a somewhat lower level of First Amendment protection than noncommercial speech. The city argued that this fact alone allows the prohibition of commercial speech while allowing noncommercial speech that is equally harmful to the city's asserted interest to remain untouched. In response to this argument, the Supreme Court stated:

> the city contends that safety concerns and visual blight may be addressed by a prohibition that distinguishes between commercial and noncommercial publications that are equally responsible for those problems. In Bolger, however, in rejecting 'offensive' speech, [we] specifically declined to recognize a distinction between commercial and noncommercial speech that would render this interest a sufficient justification for a prohibition of commercial speech.

*Discovery Network,* —— U.S. at ——, 113 S.Ct. at 1515 (internal quotations and citations omitted). The Court further elaborated on this point, stating: "the distinction bears no relationship whatsoever to the particular interests that the city has asserted. It is therefore an impermissible means of responding to the city's admittedly legitimate interests." *Discovery Network,* —— U.S. at ——, 113 S.Ct. at 1514.

In the instant case, there are legitimate justifications related to the city's substantial interest for distinguishing between billboards and the other types of mediums which the ordinance does not affect. The distinction between the permitted and prohibited forms of advertising rests on the effect that different mediums have on adolescents.

Judge Hargrove in *Penn I,* in describing the very same billboards that are the subject of this litigation, stated:

> a billboard is a constant fixture in a neighborhood. It looms over children every day while they walk to school, and every time they play in their neighborhood, thus forming an inescapable part of their daily life.... Furthermore, despite protestations to the contrary, the reality is that billboard advertisements for alcoholic beverages focus on depressed inner-city

neighborhoods. Billboards are conspicuously absent from more affluent communities. They present a stark contrast to adolescents between the lifestyle depicted in the advertisement and the actual neighborhood surrounding them thereby enhancing the attractiveness of the advertised product.

*Penn I*, 855 F.Supp. at 822. Judge Hargrove's insights are equally applicable to cigarette advertising on these same billboards. Relying on *Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983), which held that a federal statute prohibiting the mailing of unsolicited advertisements for contraceptives was in violation of the First Amendment, Penn argues that the City "cannot deprive adults of commercial information concerning cigarettes simply because the City believes that minors should not be exposed to such information." Plaintiff's Opp. to Def. Motion for Summ. Judg., at 44.

Penn advanced the same argument as it relates to alcohol advertisements in *Penn I*. Judge Hargrove concluded in *Penn I* that Penn's argument had no merit. This Court finds his reasoning persuasive. Judge Hargrove addressed Penn's argument by noting that:

In *Bolger*, however, the Supreme Court recognized that the governmental interest in protecting children may in some instances justify special treatment. Citing *FCC v. Pacifica Foundation*, 438 U.S. 726 [98 S.Ct. 3026, 57 L.Ed.2d 1073] (1978), which upheld a restriction on broadcasting in order to protect children, the Court emphasized the narrowness of the holding based on the uniquely pervasive and accessible nature of the broadcasting medium. In distinguishing *Bolger* from *Pacifica*, the Court found that the receipt of mail is far less intrusive and uncontrollable than broadcasting. The Court noted that parents already exercise substantial control over mail once it enters their mailboxes and are entitled under a federal statute to limit their receipt of sexually provocative material. Therefore, an additional regulation prohibiting unsolicited advertisements on contraceptives was unnecessary.

*Penn I*, 855 F.Supp. at 820 (internal quotations and citations omitted).

Judge Hargrove went on to note that "As in the broadcasting context, parents are similarly unable to control their children's exposure to outdoor billboard advertisements." *Id.* at 820. As the Supreme Court explained in *Packer*,

There is a difference which justifies the classification between display advertising and that in periodicals or newspapers: 'Billboards, street car signs, and placards and such are in a class by themselves.... Advertisements of this sort are constantly before the eyes of observers on the streets and in street cars to be seen without the exercise of choice or volition on their part. Other forms of advertising are ordinarily seen as a matter of choice on the part of the observer. The young people as well as the adults have the message of the billboard thrust upon them by all the arts and devices that skill can produce. In the case of newspapers and magazines, there must be some seeking by the one who is to see and read the advertisement. The radio can be turned off, but not so the billboard or street car placard. These distinctions clearly place this kind of advertisement in a position to be classified so that regulations or prohibitions may be imposed....' The legislature may recognize degrees of evil and adapt its legislation accordingly.

*Packer Corp. v. Utah*, 285 U.S. 105, 110, 52 S.Ct. 273, 274–75, 76 L.Ed. 643 (1932) (citing *State v. Packer Corp.*, 77 Utah 500, 297 P. 1013, 1019 (1931)). Thus, there is a legitimate justification relating to the City's asserted interest for differentiating billboards from other types of media which are less accessible to children and to which parent's can control their children's exposure, media such as newspapers, magazines and signs inside stores which sell cigarettes.

There is also a legitimate reason in line with the City's asserted interest for differentiating between the restricted billboards and advertisements on the storefronts of businesses that sell cigarettes. The Supreme Court addressed this issue in *Discovery Network* in their discussion of *Metromedia*. The Court explained that "the offsite-onsite dis-

tinction involved disparate treatment of two types of commercial speech. Only the onsite signs served both the commercial and public interest in guiding potential visitors to their intended destinations." *Discovery Network,* —— U.S. at —— n. 20, 113 S.Ct. at 1514 n. 20 (internal quotations and citations omitted). In rejecting a similar argument, the Fifth Circuit in *Dunagin* stated "the restrictions permit certain types of informational advertising of use to the consumer ..., but bar those displays that it believes will encourage excess consumption." *Dunagin,* 718 F.2d at 751. The reasoning of the Supreme Court and the Fifth Circuit also applies to the case now before this Court. The City seeks to prevent the exposure of minors to advertisements that will increase their demand for cigarettes. They do not seek to hide the locations of establishments that sell cigarettes, thereby placing obstacles in the way of adult smokers seeking to purchase cigarettes and harming local businesses. The restriction on billboard advertisements substantially promotes the City's goal by banning a particularly large and attention-attracting medium that the City believes will stimulate demand among minors. Ordinance 307 accomplishes this while not unnecessarily interfering with local businesses or adult smokers by prohibiting the smaller on-site advertisements that likely have less influence on youngsters and serve a commercial and public interest by informing adult smokers of where cigarettes may be purchased.

■ As the Supreme Court stated in *Edge:*

> Nor do we require that the government make progress on every front before it can make progress on any front. If there is an immediate connection between advertising and demand, and the federal regulation decreases advertising, it stands to reason that the policy of decreasing demand for gambling is correspondingly advanced. Accordingly, the government may be said to advance its purpose by substantially reducing lottery advertising, even where it is not wholly eradicated.

*Edge,* —— U.S. at ——, 113 S.Ct. at 2707. Therefore, this Court would not find Ordinance 307 unconstitutional even if several of the unrestricted mediums of which Penn complains were not easily distinguishable from billboards because the City need not make progress on all fronts before attempting to make progress on any. Furthermore, the government has made progress on other fronts more similar to billboard advertising than the unrestricted mediums. This can be seen in the Public Health Cigarette Smoking Act of 1969, 15 U.S.C.A. § 1335 (1970), which prohibits cigarette advertising on any medium of electronic communication, and in Executive Order No. 01.01.1993.33 signed by Governor Schaefer on December 20, 1993, Md. Reg., Vol. 21, Issue 1, pg. 14 (Jan. 7, 1994 issue), which prohibits the renewal of contracts for cigarette advertisements on MTA busses. In banning cigarette advertisements on television, radio and MTA busses, these restrictions place prohibitions on similar types of mediums to the billboards restricted by Ordinance 307. All of the restricted mediums are unusually accessible to and influential on minors and parents lack control over their children's exposure to each.

Penn also claims that Ordinance 307 is underinclusive because the restrictions on billboard advertising will only lead to an increase in cigarette advertising in the mediums remaining unrestricted, thus frustrating the City's asserted purpose of decreasing the exposure of minors to cigarette advertising. The Court is not persuaded by this argument. Penn has given no reason to accept this proposition beyond its unsubstantiated assertion. Even if the Court were to accept Penn's proposition, the City's asserted substantial interest would still be forwarded unless the advertising budget of tobacco companies shifted its focus from billboards to unrestricted mediums that are as accessible to and influential on minors as billboards and to which parents similarly have little control over the exposure of their children. With the bans on advertisement in the electronic media and on MTA busses, it seems most improbable that such a hypothesized shift would increase advertising in such areas.

■ Penn further argues that Ordinance 307 fails to satisfy the fourth prong of the *Central Hudson* test because alternative, less burdensome means exist to decrease the pur-

chase and consumption of cigarettes by minors, such as increased enforcement of the existing prohibition of cigarette sales to minors. But as Judge Hargrove stated in *Penn I:*

> The mere suggestion of alternatives, however, does not conclusively establish that the City's chosen means are not narrowly tailored; a reasonable fit is all that is necessary: 'A judge need not agree with the decisionmaker as to the most appropriate method for promoting a governmental interest; as long as there is a reasonable fit between the restriction and the interest served, the manner of regulation is left to the decisionmaker.' In other words, although consideration of alternatives is an element of 'reasonable fit,' it is not dispositive.

*Penn I*, 855 F.Supp. at 819 (quoting *Destination Ventures v. F.C.C.*, 844 F.Supp. 632, 638 (D.Or.1994) (citations omitted)). This Court holds that the City's chosen means are narrowly tailored to advance the City's asserted interest of decreasing the exposure of minors to stimuli that would encourage them to purchase cigarettes, thereby decreasing the number of illegal transactions and discouraging the purchase and consumption of cigarettes by minors. The City has limited the ban on cigarette advertising to billboards in neighborhoods in which children would typically be found such as the areas in which they live, attend school and church and recreate. In those residential and business zones in which children would not normally be found, the ordinance has no effect.[3] Ordinance 307 is also narrowly tailored in that it applies only to a narrow medium, billboards, which are particularly problematic in that they are easily accessible to children and parents lack control over their children's exposure to such advertisements, while leaving other mediums, such as newspapers, magazines, and signs inside licensed premises, which do not cause these specific problems, unrestricted. Also left unrestricted are signs outside premises which sell cigarettes, thus allowing licensed distributors of cigarettes to identify themselves and their wares. For all

these reasons, this Court holds that Ordinance 307 satisfies the fourth prong of the *Central Hudson* test.

Having determined that Ordinance 307 has satisfied all four prongs of the *Central Hudson* test, this Court holds that Ordinance 307 does not violate the First Amendment. Accordingly, this Court will grant the City's motion for summary judgment on this claim.

### B. Ordinance 307 is not pre-empted by the Federal Cigarette Labeling and Advertising Act

#### 1. Pre-emption Analysis: Generally

Article VI of the Constitution provides that the laws of the United States "shall be the supreme law of the land; any Thing in the Constitution or Laws of any state to the Contrary notwithstanding." U.S. Const. Art. VI, cl. 2. Thus, since the Supreme Court's decision in *M'Culloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 427, 4 L.Ed. 579 (1819), it has been settled that state law that conflicts with Federal law is "without effect." *Maryland v. Louisiana*, 451 U.S. 725, 746, 101 S.Ct. 2114, 2128, 68 L.Ed.2d 576 (1981). Pre-emption analysis "start[s] with the assumption that the historic police powers of the States [are] not to be superseded by ... Federal Act unless that [is] the clear and manifest purpose of Congress." *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947). Accordingly, " 'the purpose of Congress is the ultimate touchstone' " of pre-emption analysis. *Malone v. White Motor Corp.*, 435 U.S. 497, 504, 98 S.Ct. 1185, 1190, 55 L.Ed.2d 443 (1978) (quoting *Retail Clerks v. Schermerhorn*, 375 U.S. 96, 103, 84 S.Ct. 219, 222, 11 L.Ed.2d 179 (1963)).

The Supreme Court further elaborated upon the proper approach to issues arising under the Supremacy clause in its opinion in *Cipollone v. Liggett Group, Inc.:*

> Congress' intent may be explicitly stated in the statute's language or implicitly contained in its structure and purpose. In the absence of an express congressional com-

---

**3.** The eleventh exception to Ordinance 307 makes the ordinance inapplicable in the zoned areas described above.

mand, state law is preempted if that law actually conflicts with federal law or if federal law so thoroughly occupies a legislative field as to make reasonable the inference that Congress left no room for the States to supplement it.

*Cipollone v. Liggett Group, Inc.,* —— U.S. ——, ——, 112 S.Ct. 2608, 2617, 120 L.Ed.2d 407 (1992) (internal quotations and citations omitted).

### 2. History of the Federal Cigarette Labeling and Advertising Act

The Surgeon General convened an advisory committee in 1962 to examine the issue of whether there was a link between smoking and illness. In 1964, the advisory committee issued its report, which stated as its central conclusion: "Cigarette smoking is a health hazard of sufficient importance in the United States to warrant appropriate remedial action." U.S. Dept. of Health, Educ. and Welfare, U.S. Surgeon General's Advisory Comm., Smoking and Health 33 (1964). Following this report, the Federal Trade Commission (FTC) and several states separately moved to regulate the advertising and labeling of cigarettes. *See, e.g.,* 29 Fed.Reg. 8325 (1964); 1965 N.Y.Laws, ch. 470; *see also* 111 Cong.Rec. 13900–13902 (1965) (statement of Sen. Moss).

This activity led Congress to enact the Federal Cigarette Labeling and Advertising Act (FCLAA) in July 1965. Pub.L. 89–92 (1965), 79 Stat. 282, as amended, 15 U.S.C. §§ 1331–1340 (hereinafter the "1965 Act"). In Section 2, the 1965 Act declared its competing dual purposes: (1) adequately informing the public that cigarette smoking may be hazardous to your health, and (2) protecting the national economy from the burden imposed by diverse, nonuniform and confusing cigarette labeling and advertising regulations. Pub.L. 89–92, § 2 (1965), 79 Stat. 282, as amended, 15 U.S.C. § 1331(2). In furtherance of its first purpose, the 1965 Act required the warning statement "Caution: Cigarette Smoking May Be Hazardous to Your Health" on cigarette packages. Pub.L. 89–92, § 4 (1965), 79 Stat. 283. In recognition of its second purpose, the 1965 Act explicitly preempted FTC and state regula-

tion by specifying that "no statement relating to smoking and health, other than the statement required by section 4 of this Act, shall be required on any cigarette package," and that until July 1, 1969, "no statement relating to smoking and health shall be required in the advertising of any cigarettes the packages of which are labeled in conformity with the provisions of this Act." *Id.* at §§ 5, 10.

The *Public Health Cigarette Smoking Act of 1969,* Pub.L. 91–222, 84 Stat. 87, as amended, 15 U.S.C. §§ 1331–1340, (hereinafter the "1969 Act"), strengthened the warning label, changing the warning message to "Warning: The Surgeon General Has Determined That Cigarette Smoking Is Dangerous to Your Health," and prohibited cigarette advertising on television and radio. In addition, the preemption clause of the statute was changed to its present form: "No requirement or prohibition based on smoking and health shall be imposed under State law with respect to the advertising or promotion of any cigarettes the packages of which are labeled in conformity with the provisions of this Act." Pub.L. 89–92, § 5(b) (1965), 79 Stat. 283 (codified at 15 U.S.C. § 1334(b)).

Federal cigarette labeling and advertising regulation reached its present form through the *Comprehensive Smoking Education Act,* Pub.L. 98–474, 98 Stat. 2200 (1984) (codified at 15 U.S.C. § 1331–1341) [hereinafter the "1984 Act"]. This act changed the warning format to a rotation of four different warning messages and extended the warning requirement to cigarette advertisements.

### 3. Analysis

The Supreme Court first addressed the question of the pre-emptive reach of the FCLAA in *Cipollone v. Liggett Group, Inc.,* —— U.S. ——, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992). In *Cipollone,* the son of Rose Cipollone, who began smoking in 1942 and died of lung cancer in 1984, attempted to recover damages for her death from the defendant cigarette manufacturers on the basis of several state common law claims. Cipollone claimed that the defendants had breached express warranties contained in their advertising, failed to warn consumers about the hazards of smoking, fraudulently misrepresented those hazards to consumers and con-

spired to deprive the public of medical and scientific information about smoking. Defendants argued that the state law claims were pre-empted by the FCLAA. The Court held that the 1965 Act did not pre-empt any of Cipollone's claims. The plurality held that the 1969 Act pre-empted Cipollone's claims that were based on a failure to warn and the neutralization of federally mandated warnings to the extent such claims relied on omissions or inclusions in the tobacco manufacturer's advertising while not pre-empting those claims that were based on express warranty, intentional fraud and misrepresentation, or conspiracy theories.

In order for the *Cipollone* Court to rule, the Court necessarily undertook a thorough analysis of the pre-emptive reach of the 1965 and 1969 Acts. While the 1969 Act broadened the pre-emptive reach of the 1965 Act, *Cipollone,* at —— – ——, 112 S.Ct. at 2619–21, the 1984 Act did not alter the 1969 Act with respect to pre-emption. Thus, the pre-emptive scope of the FCLAA has not changed since the 1969 Act. Therefore, the Court's discussion of the pre-emptive scope of the 1969 Act establishes the relevant standard of inquiry for the instant case. This is the only portion of the Court's analysis that is germane to the instant case.

In arriving at its conclusions concerning whether Cipollone's claims were pre-empted, the Court held that "the pre-emptive scope of the . . . 1969 Act is governed entirely by the express language in § 5 of [the] Act." *Id.* at ——, 112 S.Ct. at 2618. The Court explained:

> When Congress has considered the issue of pre-emption and has included in the enacted legislation a provision explicitly addressing that issue, and when that provision provides a reliable indicium of congressional intent with respect to state authority, there is no need to infer congressional intent to pre-empt state laws from the substantive provisions of the legislation. Such reasoning is a variant of the familiar principle of *expressio unius est exclusio alterius:* Congress' enactment of a provision defining the pre-emptive reach of a statute implies that matters beyond that reach are not pre-empted. In this

case, the other provisions of the . . . [Act] offer no cause to look beyond § 5 of [the] Act. Therefore, we need only identify the domain expressly pre-empted by each of those sections.

*Id.* at ——, 112 S.Ct. at 2618.

The Court further elaborated on the standards for considering the pre-emptive power of § 5(b) of the 1969 Act: "we must fairly but—in light of the strong presumption against pre-emption—narrowly construe the precise language of § 5(b) and we must look to each of petitioner's common law claims to determine whether it is in fact pre-empted." *Id.* at ——, 112 S.Ct. at 2621. Justice Stevens, with the support of a plurality of the Court, explained that the applicable inquiry in determining whether a claim is pre-empted by the 1969 Act is

> whether the legal duty that is the predicate of the common law damages action constitutes a 'requirement or prohibition based on smoking and health . . . imposed under State law . . . with respect to . . . advertising or promotion,' giving that clause a fair but narrow reading. . . . [E]ach phrase within that clause limits the universe of common law claims preempted by the statute.

*Id.* at ——, 112 S.Ct. at 2621.

Now that the applicable standards of inquiry into the pre-emptive scope of the 1969 Act, as dictated by the Supreme Court in *Cipollone,* have been established, this Court may now analyze the claims before it. Penn claims that Ordinance 307, a prohibition imposed under State law which regards advertising, is based on smoking and health and is therefore pre-empted by the FCLAA. Penn arrives at this conclusion on three bases. First, Penn argues that Article 27, § 404 is based on smoking and health because the precursor to § 404, an 1886 Maryland law banning sale of cigarettes to minors, recites that it is an "AN ACT TO PROTECT THE HEALTH AND MORALS OF MINORS. . . ." The City asserts that Ordinance 307 was promulgated with the purpose of further effectuating § 404. Penn argues that because § 404 is based on smoking and health, an ordinance meant to further § 404 is also based on smoking and health.

Even if this Court were to accept Penn's assertion that § 404 is based on smoking and health,[4] this Court would still not accept Penn's argument. The underlying purpose of § 404 is irrelevant to this analysis. The validity of § 404 has not been challenged, nor could it be challenged. It is certainly within the City's power to pass a law meant to effectuate a valid State law.

■ It is clear that Ordinance 307 is such a law. The purpose of Ordinance 307 is to further effectuate § 404, a valid State law. The Preamble to Ordinance 307 cites § 404 as the impetus for its promulgation along with abundant statistics concerning the prevalence of underage smoking to demonstrate the necessity of Ordinance 307 as a means to increase the effectiveness of § 404. Furthermore, Ordinance 307 is obviously designed to accomplish this goal. The City has limited the ban on cigarette advertising to billboards in neighborhoods in which children would typically be found such as the areas in which they live, attend school and church and recreate. In those residential and business zones in which children would not normally be found, the ordinance has no effect.[5] Ordinance 307 is also narrowly tailored in that it applies only to a narrow medium, billboards, which are particularly problematic in that they are easily accessible to children and parents lack control over their children's exposure to such advertisements. Ordinance 307 has no effect upon other mediums which do not cause these specific problems, such as newspapers, magazines, and signs inside licensed premises. Ordinance 307 is clearly aimed at the illegal sale of cigarettes to minors. Its purpose is to effectuate § 404 and, therefore, Ordinance 307 is not " 'based on smoking and health . . .' giving that clause a fair but narrow reading." *Id.* at ——, 112 S.Ct. at 2621.

This holding is in line with the holding of the Supreme Court in *Cipollone*. In *Cipollone*, the Court held that Cipollone's claims of intentional fraud and misrepresentation were not pre-empted because they were not " 'based on smoking and health' but rather on a more general obligation—the duty not to deceive." *Id.* at ——, 112 S.Ct. at 2624. The Court further held that Cipollone's conspiracy claim was not pre-empted because "this duty . . . is not a prohibition 'based on smoking and health' as that phrase is properly construed," *Id.* at ——, 112 S.Ct. at 2624, but, rather, it is based on a more general duty—the duty not to conspire to commit fraud. Similarly, Ordinance 307 is not "based on smoking and health" but rather on a more general obligation—the duty not to advertise products which are illegal for sale to minors on a medium which has undue influence on minors, or, in other words, the duty not to unduly encourage illegal transactions. This more general obligation underlying Ordinance 307 is also reflected in Baltimore Ordinance 262 which limits billboard advertisements for alcoholic beverages.

The Court reasoned that this interpretation of the phrase "smoking and health" was appropriate for two reasons: (1) "Congress intended the phrase 'relating to smoking and health' to be construed narrowly, so as not to proscribe the regulation of deceptive advertising;" *Id.* at ——, 112 S.Ct. at 2624, and (2) this interpretation of "based on smoking and health"

> is wholly consistent with the purposes of the 1969 Act. State law prohibitions on false statements of material fact do not create 'diverse, nonuniform, and confusing' standards. Unlike state law obligations concerning the warning necessary to render a product 'reasonably safe,' state law proscriptions on intentional fraud rely only on a single, uniform standard: falsity.

---

**4.** The language of the preamble to the 1886 Act may well be nothing more than a statement of legislative authority. The "health and morals" formulation is one which is routinely used by legislatures in invoking state police powers. There is no legislative history available to determine whether health concerns were in fact an issue in first enacting the ban on sale of cigarettes to minors. It is clear, however, that "[a]lthough physicians had suspected a link between

smoking and illness for centuries, the first medical studies of that connection did not appear until the 1920's. *Cipollone* at ——, 112 S.Ct. at 2615 (citing U.S. Dept. of Health and Human Services, Report of the Surgeon General, Reducing the Health Consequences of Smoking: 25 years of Progress 5 (1989).

**5.** *See* note 3.

*Id.* at ——, 112 S.Ct. at 2624. Thus, the Court concluded that "the phrase 'based on smoking and health' fairly but narrowly construed does not encompass the more general duty not to make fraudulent statements." *Id.* at ——, 112 S.Ct. at 2624. Accordingly, the Court held that Cipollone's claim was not pre-empted. The Court went on to note that this reasoning was equally applicable to Cipollone's conspiracy claims and held that these claims were also not pre-empted.

■ Likewise, this interpretation of the phrase "smoking and health" is appropriate in the instant case for the same reasons. A narrow construction of the phrase "smoking and health" is appropriate because Congress did not intend to interfere with a State's regulation of tobacco sales to minors. The Report of the United States Senate which accompanied the enactment of the FCLAA makes that point clear: "[Section 1334] would in no way affect the power of any State ... with respect to ... the sale of cigarettes to minors." S.Rep. No. 91–566, 91st Cong., 1st Sess. 12 (1970), *reprinted in* 1970 U.S.C.C.A.N. 2652, 2663. Moreover, such an interpretation is consistent with the purposes of the 1969 Act. Ordinance 307 does not create "diverse, nonuniform, and confusing" standards and relies on only a single, uniform standard: illegality.

The instant case differs from the claims that the *Cipollone* Court did find pre-empted. The Court held that Cipollone's failure to warn and neutralization of federally mandated warnings claims were pre-empted to the extent that they required "a showing that [the tobacco manufacturer's] post–1969 advertising ... should have included additional, or more clearly stated, warnings." *Cipollone,* —— U.S. at ——, 112 S.Ct. at 2621. Ordinance 307 does not require any additions or alterations in the federally-mandated warning labels. Therefore, Ordinance 307 is distinguishable from Cipollone's pre-empted failure to warn and neutralization of federally mandated warnings claims.

The Court also found the first of Cipollone's fraudulent misrepresentation claims to be pre-empted. This claim was based on a state-law prohibition against statements in advertising and promotional materials that tended to minimize the health hazards associated with smoking. The Court held that the state prohibition was pre-empted because it was based on smoking and health and regarded advertising. Thus, Cipollone's claim based on this state prohibition could not stand. The Ordinance challenged in the present action, Ordinance 307, was promulgated to effectuate § 404. Unlike the state-law prohibition in *Cipollone,* the validity of § 404 is not challenged by Penn. Thus, Cipollone's claim is not analogous to the instant case.

Penn's second argument in support of its assertion that Ordinance 307 is "based on smoking and health" is that, regardless of whether § 404 was "based on smoking and health," the true impetus behind the promulgation of Ordinance 307 was smoking and health concerns.

> Contrary to Defendant's contentions, concerns about smoking and health were, in fact, in the forefront of the City's concerns when it enacted Ordinance 307. Notwithstanding the City's efforts to obfuscate and camouflage those concerns, they none-the-less leaked out into the transcript of the City Council hearing on Ordinance 307.... Although apparently advised by their lawyers that if they abstained from saying the "H" word (health) they could successfully ... not implicate the FCLAA pre-emption doctrine, the Chairman of the Hearing and the chief administrator of the city agency directly charged with protecting public health nevertheless let slip what everyone in the hearing room knew; that this cigarette advertising ban was based on concerns about smoking and health.

Plaintiff's Opp. to Def. Motion for Summ. Judg. at 11–12.

■ The "slips" Penn refers to occurred during the combined public hearings held on November 17, 1993 for Ordinances 307 and 262 before the City Council. The first "slip" Penn refers to was Chairman Anthony Ambridge's two statements that "These [Ordinances 307 and 262] will call into question several legal, health and aesthetic issues," Def.App. Ex. 6 p. 9, and "Federal and State governments have already determined that placing age restrictions on consumption of

alcohol and tobacco products is in the public's health interest." Def.App. Ex. 6 p. 12. The second reference is to a letter from Dr. Peter Beilenson, the Commissioner of Health, that was received into the record by the City Council. In this letter, Dr. Beilenson wrote, "Not only is smoking a health hazard to the smoker ... As we know, smoking is a health hazard to all in the immediate vicinity." Def. App. Ex. 6 p. 239.

Penn's suggestion that these comments change the purpose of Ordinance 307 is misguided. The City Council hearing process is an open one. Dozens of scientific experts, industry representatives, merchants, legal advisers and interested community members spoke their mind. The mention of "the 'H' word" at such a hearing could not change the purpose of the legislation in question from that clearly stated in the law the legislature finally chose to adopt. As the Supreme Court observed in *Connecticut National Bank v. Germain,* 503 U.S. 249, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992),

> [I]n interpreting a statute a court should always turn first to one, cardinal canon before all others. We have stated time and time again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there.... When the words of a statute are unambiguous, then, this first canon is also the last: judicial inquiry is complete.

*Id.* at 1149 (internal quotations and citations omitted). The City clearly stated what its purpose was in promulgating Ordinance 307: to effectuate § 404. Therefore, this Court need look no further than the language of Ordinance 307. In *Bath Iron Works Corp. v. Director, Office of Workers' Compensation Programs,* —— U.S. ——, 113 S.Ct. 692, 121 L.Ed.2d 619 (1993), the Supreme Court stated "we find the text of the statute unambiguous on the point at issue; accordingly, we give no weight to a single reference by a single Senator during floor debate in the Senate." *Id.* at ——, 113 S.Ct. at 700. Likewise, in light of the clarity of the language the legislature chose to use in addressing the purpose of Ordinance 307 in its Preamble, this Court gives no weight to the statements of Chairman Ambridge and Dr. Beilenson.

The statements of Chairman Ambridge are irrelevant for yet another reason. The statements of Chairman Ambridge merely reflect his view as to the purpose of § 404, the prohibition against the sale of cigarettes to minors. But the purpose of § 404 is irrelevant to the present inquiry for the reasons discussed earlier. Therefore, Chairman Ambridge's remarks are irrelevant as well. And it certainly is no surprise that Dr. Beilenson, the Commissioner of Health, noted the potential health impact of a bill under consideration at a public forum for the discussion of the passage of that bill. In fact, it is expected that he address possible health impacts of ordinances under consideration. Thus, Dr. Beilenson's letter also does not change the purpose of the legislature in passing the statute.

Penn also attempts to impute a health motive to Ordinance 307 by directing this Court to the tenth paragraph of the seventh whereas clause of the Preamble to Ordinance 307: "Cigarettes are a 'gateway' drug among Maryland students, i.e., a substance often used by adolescents as a first drug which appears to 'open the door' for use of harder drugs at a later date." Penn asserts that the City's stated concern regarding cigarettes as a "gateway" drug can be nothing but a health concern and that, therefore, Ordinance 307 is "based on smoking and health." This argument is also not persuasive. Penn interprets this subsection of the Preamble as if it stands alone, separate from the remainder of Ordinance 307. This is an improper method of statutory construction. "[A] statutory subsection may not be considered in a vacuum, but must be considered in reference to the statute as a whole." Sutherland Stat Const § 46.05 (5th Ed). As established earlier, Ordinance 307 clearly states that its focus is illegality. In light of this, it is apparent that this subsection also refers to illegality: the illegal use of "harder drugs."

Penn relies heavily on *Vango Media, Inc. v. City of New York,* 829 F.Supp. 572 (S.D.N.Y.1993). This case concerned Vango's challenge of a New York City ordinance which required the display of one public health message pertaining to the health dangers of smoking for every four tobacco ad-

vertisements on certain property and facilities owned, operated or licensed by the City of New York, including taxicabs. But *Vango* substantially differs from the present case. The New York law required, as a condition of cigarette advertising, a different message regarding the health risks of smoking than the federally-mandated warning, thus bringing the statute into conflict with the second stated purpose of the FCLAA. As the district court noted in holding that the statute was pre-empted by the FCLAA, "Congress had in mind avoiding precisely the type of anti-smoking message requirement now before this Court. The Local Law creates a regulation directly related to advertising that is 'diverse, nonuniform, and confusing' *vis a vis* the federal legislation." *Id.* at 583 (quoting 15 U.S.C. § 1331 (1970)). Ordinance 307 does not require any message at all, let alone a message that conflicts with the one mandated by Congress.

This Court finds that Ordinance 307 is not "based on smoking and health." Rather, Ordinance 307 is clearly focused on illegality. Therefore, this Court holds that Ordinance 307 is not a "requirement or prohibition based on smoking and health ... imposed under State law with respect to the advertising or promotion of ... cigarettes," and is not pre-empted by the FCLAA. Accordingly, this Court will grant the City's motion for summary judgment.

### C. Ordinance 307 is not pre-empted by Maryland State Law

Penn next claims that Ordinance 307 is pre-empted by state law. Analogous to Federal law, "state law may pre-empt local law in one of three ways: (1) pre-emption by conflict, (2) express pre-emption, or (3) implied pre-emption." *Allied Vending v. Bowie,* 332 Md. 279, 631 A.2d 77 (1993). Penn argues that Ordinance 307 is invalid in that State law precludes it by the doctrine of implied pre-emption. The Court in *Allied Vending*

elaborated upon this form of pre-emption, noting that:

> In *Sitnick,* we explained the theory of implied pre-emption: '[W]e wish it understood that there may be times when the legislature may so forcibly express its intent to occupy a specific field of regulation that the acceptance of the doctrine of pre-emption by occupation is compelled.'

*Id.* at 298, 631 A.2d 77 (quoting *Mayor of Baltimore v. Sitnick,* 254 Md. 303, 323, 255 A.2d 376, 385 (1969)). Penn asserts that the State of Maryland has so forcibly expressed its intent to occupy the field of cigarette sales regulation as to pre-empt any local legislation in this area. Penn next argues that because the purpose of Ordinance 307 is to effectuate § 404, a prohibition of the sale of cigarettes to minors, Ordinance 307 is pre-empted by State law. Even if this Court accepts the proposition that Ordinance 307 would be pre-empted if Maryland State law completely occupied the field of cigarette sales regulation, a precarious position at best,[6] this argument could not succeed because the State has not completely occupied that field. Penn relies principally on *Allied Vending* in attempting to establish this proposition.

Penn asserts that the Maryland Court of Appeals in *Allied Vending* held that the State of Maryland has completely occupied the field of cigarette sales regulation, thus pre-empting any local legislation in this area by implication. Penn has misread *Allied Vending.* The Court in *Allied Vending* emphatically held that "in light of the comprehensive state-licensing scheme for cigarette vending machines provided by Article 56, §§ 607 through 631," *Allied Vending,* 332 Md. at 300, 631 A.2d 77, the State has expressed its intent to completely occupy the field of the sale of cigarettes through vending machines. In conclusion, the Court stated:

> In short, through the enactment of Article 56, §§ 607 through 631, the General As-

---

**6.** This position is questionable because Ordinance 307 regulates advertising, not sales. Though its purpose is to forward § 404, a law regulating sales, it is unclear to this Court whether this purpose would place a zoning ordinance regulating the placement of billboards, an area traditionally within the City's power, within the

scope of the field Penn asserts is pre-empted, the field of cigarette sales regulation. This Court need not reach a conclusion regarding this issue because it is unnecessary to its holding. Therefore, this Court will not travel farther down this road.

sembly has manifested an intent for the State to completely occupy the field of the sale of cigarettes through vending machines rendering any local or municipal ordinances in this area constitutionally invalid.

*Id.* at 310, 631 A.2d 77. Thus, the preemptive scope of Maryland State law, as established in *Allied Vending,* is substantially less broad than Penn asserts.

■ Ordinance 307 does not fall within the pre-emptive scope of §§ 607–631. The purpose of Ordinance 307 is to effectuate § 404, the State law prohibition of the sale of cigarettes to minors. Though the reach of the field pre-empted—regulation of the sale of cigarettes through vending machines—overlaps the reach of § 404—the sale of cigarettes to minors—the two are distinct and separate fields. Penn does not claim that § 404 demonstrates the intent of the State to completely occupy the field of the regulation of cigarette sales to minors, nor, in this Court's view, would it have been successful had it chosen to do so. Therefore, this Court holds that Ordinance 307 has not been pre-empted by State law. Accordingly, this Court will grant the City's motion for summary judgment on this claim.

### III. *CONCLUSION*

For the foregoing reasons, the City's motion for summary judgment will be granted as to all claims. The Court will enter a separate Order consistent with this Memorandum.