PAEZ, Circuit Judge,
dissenting:
I agree with Judge Bea’s conclusions, contained in Part III of his opinion, that substantial evidence supports Congress’s determination that advertising by for-profit entities on public broadcast stations poses a real harm, and that 47 U.S.C. § 399b(a)(l) does not burden substantially more speech than necessary to further the government’s legitimate interest. However, as I explain in greater detail below, I agree neither with Judge Bea’s analytical approach, nor with his conclusion that § 399b(a)(2) and (3) impose an unconstitutional, content-based restriction on speech. Accordingly, I respectfully dissent.[1]
For almost sixty years, noncommercial public broadcasters have been effectively insulated from the lure of paid advertising. The court’s judgment will disrupt this policy and could jeopardize the future of public broadcasting. I am not persuaded that the First Amendment mandates such an outcome. In my view, § 399(a)(2) and (3) satisfy the scrutiny standard set forth in F.C.C. v. League of Women Voters, 468 U.S. 364, 104 S.Ct. 3106, 82 L.Ed.2d 278 (1984). I therefore disagree with Judge Bea’s heavy reliance on a commercial speech case, City of Cincinnati v. Discovery Network, Inc., 507 U.S. 410, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993), to impose an unprecedented and unwarranted burden of proof on the government. I also take issue with Judge Bea’s contention that Turner Broad. Sys., Inc. v. F.C.C. (“Turner I”), 512 U.S. 622, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994) and Turner Broad. Sys., Inc. v. F.C.C. (“Turner II”), 520 U.S. 180, 117 S.Ct. 1174, 137 L.Ed.2d 369 (1997) require the government to prove its case by presenting “ ‘[substantial evidence^]’ [which] must include ‘substantial evidence in the record before Congress’ at the time of the statute’s enaction.” Op. at 880 (quoting Turner II, 520 U.S. at 211, 117 S.Ct. 1174) (internal citation omitted). Because § 399b(a)(2) and (3) are narrowly tailored provisions that fulfill the government’s substantial interest in noncommercial public broadcasting, I would affirm the district court’s order granting summary judgment to the FCC.
I.
I agree with both Judge Bea and Judge Noonan that because § 399b regulates broadcast media, the broadcast-specific version of intermediate scrutiny[2] should
*893 guide our analysis of this case. As Judge Bea’s opinion notes, a regulation will survive such scrutiny if it is “narrowly tailored to further a substantial government interest.” League of Women Voters, 468 U.S. at 380, 104 S.Ct. 3106 (cited at Op. 878).[3] As noted, I also agree with Judge Bea’s twin conclusions that the government has a substantial interest in noncommercial public broadcasting and that § 399b furthers this interest. I differ from both Judge Bea and Judge Noonan in my conclusion that § 399b(a)(2) and (3) are sufficiently tailored to survive broadcast scrutiny. Judge Bea’s analysis draws from cases involving non-broadcast, content-neutral, and commercial speech restrictions. I disagree with this approach, and would decide this case by hewing closely to League of Women Voters, which is directly on point.
From League of Women Voters we can derive several principles to guide our analysis of whether § 399b(a)(2) and (3) are narrowly tailored. In League of Women Voters, the Supreme Court explained that a broadcasting regulation is narrowly tailored when it is not “manifestly] imprecise,” 468 U.S. at 392, 104 S.Ct. 3106, when it is not patently overinclusive or underinclusive, id. at 396, 104 S.Ct. 3106, and when “less restrictive means” of furthering the government’s interest are not “readily available,” id. at 395, 104 S.Ct. 3106. Moreover, if a content-based broadcasting regulation “far exceeds” what is necessary to satisfy the government’s interest, then it is “not narrowly tailored.” Id. at 395, 104 S.Ct. 3106. In my view, § 399b(a)(2) and (3) satisfy these requirements.
First, the law is not “patently] overinclusive[ ].” Id. at 396, 104 S.Ct. 3106. On the contrary, the legislative history of § 399b demonstrates that the law was crafted to restrict the least possible amount of speech. Before the passage of § 399b, public broadcasters were prohibited from airing all advertisements. See, e.g., 17 Fed.Reg. 4062 (1952) (47 C.F.R. § 3.621(d), (e)) (later moved to 47 C.F.R. *894 § 73.621(d), (e)); In the Matter of Comm’n Policy Concerning the Noncommercial Nature of Educ. Broad. Stations (“Comm’n Policy I ”), 86 F.C.C.2d 141,142 (1981) (discussing the “existing proscription against all promotion of products and services”) (emphasis in original). The Public Broadcast Amendments Act of 1981, codified in 47 U.S.C. §§ 399a and 399b, modified these restrictions to enhance donor acknowledgments, to allow public broadcasters to air any content (including advertisements) for which consideration is not received, and to allow nonprofit organizations to advertise services, products, and facilities. In light of these modifications, § 399b is less restrictive of public broadcasters’ First Amendment rights than the statute at issue in League of Women Voters, which broadly prohibited all editorial content from being broadcast. In contrast to the statute at issue in League of Women Voters, § 399b gives broadcasters programming flexibility while still insulating the stations from the “commercial market pressures” that result from reliance on advertising revenue. Comm’n Policy I, 86 F.C.C.2d at 142. Thus, § 399b is not overinclusive—at least not in my view—nor does it “far exceed[ ]” what is necessary to satisfy the government’s interest in promoting non-commercial educational broadcasting. See League of Women Voters, 468 U.S. at 395, 104 S.Ct. 3106.[4]
Second, § 399b is not underinclusive. In League of Women Voters, the Court held that the statute in question was underinclusive because it barred editorializing but did not bar stations from choosing to air partisan content. 468 U.S. at 396-97, 104 S.Ct. 3106. Considering that the government’s purported interest was to prevent the broadcast of controversial or partisan opinions, the law was minimally effective. Id. Thus, the Court held that the underinclusive law, which “provide[d] only ineffective or remote support for the government’s purpose,” was not valid under the First Amendment. Id. (quoting Central Hudson Gas & Electric Corp. v. Public Service Comm’n of N.Y., 447 U.S. 557, 564, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980)).
Unlike the underinclusive statute at issue in League of Women Voters, Congress’s decision to allow non-profit advertising on public broadcasts has not rendered § 399b ineffective. According to Stanford Professor Roger G. Noll, a leading scholar on the economics of television, § 399b’s ban on paid commercial advertisements, political advertisements, and issue advertisements has effectively insulated public broadcasting from the market failure problem of commercial broadcasting. Lance Ozier, a senior officer of the WGBH Educational Foundation,[5] similarly explained that advertising by non-profit entities “do[es] not present the same danger” to public television as for-profit advertising. Unlike commercial, political, and issue advertisements, *895 non-profit announcements—according to Ozier—are viewed as “consistent with the public education mission of public television,” and therefore do not threaten other funding sources. Particularly, Ozier explains that the presence of just a small number of non-profit advertisers creates only a minimal risk that stations will seek to boost viewership in order to increase advertising sales. Non-profit advertising sales, for example, did not even register on Professor Noll’s breakdown of public television revenue sources. As an additional anecdote, Minority has produced just one instance in which a non-profit entity purchased an announcement on a public broadcast station. In short, advertisements by nonprofit organizations do not appear to foster the market failure problem of public broadcasting that Congress sought to avoid in enacting § 399b.[6] Thus, I would conclude that § 399b(a)(2) and (3) are not unconstitutionally underinclusive.
Third, there appear to be no “less restrictive means” that are “readily available” to further the government’s interest in promoting public broadcasting. Neither Judge Bea nor Judge Noonan offers any alternative to the current regime, and certainly not one that is “less restrictive” and “readily available.” Similarly, Professor Noll’s report lays out some plausible alternatives to § 399b, but concludes that these alternatives are not reasonable.
Thus, § 399b is not “manifestly] imprecis[e],” League of Women Voters, 468 U.S. at 392, 104 S.Ct. 3106, nor is it patently overinclusive or underinclusive, id. at 396, 104 S.Ct. 3106. Nor are there “less restrictive means” to § 399b that are “readily available.” Id. at 395, 104 S.Ct. 3106. Accordingly, I would hold that § 399b satisfies the scrutiny test laid out in League of Women Voters and affirm the district court’s grant of summary judgment to the FCC.
II.
Judge Bea’s opinion heavily relies on an inapposite commercial speech case, City of Cincinnati v. Discovery Network, 507 U.S. 410, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993), to strike down § 399b(a)(2) and (3). In my view, Judge Bea’s reliance on, and interpretation of, Discovery Network are flawed for three reasons.
First, Judge Bea relies on Discovery Network for the proposition that League of Women Voters’s narrow tailoring requirement demands that the government prove that the speech prohibited by §§ 399b(a)(2) and (3) poses a greater threat to the government’s interest than the speech allowed. Op. at 881. Because Discovery Network involved non-broadcast commercial speech, it has little relevance to this case. Discovery Network neither interpreted nor applied the narrow tailoring requirement of intermediate broadcast scrutiny, so Judge Bea’s reliance on Discovery Network is unfounded.
Second, Judge Bea’s initial mistake of relying on Discovery Network is compounded by his misreading of the case. Judge Bea states that under Discovery Network, “the government must prove that the speech banned ... poses a greater threat than the speech permitted.” Op. at 881 (emphasis in original). This is not a fair reading of Discovery Network. The portion of Discovery Network cited by Judge Bea contains the Court’s observation that all newsracks, whether containing commercial newspaper or noncommercial *896 handbills, were “equally unattractive.” 507 U.S. at 425, 113 S.Ct. 1505. Accordingly, the Court in Discovery Network found that the law in question was not effective at addressing the government’s interest in avoiding visual blight on the streets of Cincinnati. Id. at 428, 113 S.Ct. 1505. I therefore read Discovery Network to support the accepted notion that a regulation burdening speech cannot be under-inclusive to the point of inefficacy. Accord League of Women Voters, 468 U.S. at 397, 104 S.Ct. 3106. I do not believe, however, that Discovery Network stands for the broad proposition that the government must prove that all banned speech is more harmful than all allowed speech. This holding imposes a burden on the government that surpasses even the exacting standard of strict scrutiny. In order to meet Judge Bea’s heavy burden, Congress would have to ban either all advertisements or no advertisements because no regulation that creates categorical distinctions could plausibly encompass only the most harmful content imaginable.[7]
Third, even if Discovery Network were applicable to this case, which I believe it is not, I disagree with Judge Bea’s unsubstantiated conclusion that public issue and political advertisements “pose identical threats” to the unique programming of public broadcasting as non-profit advertisements. Op. at 889. Since Congress intended to shield public programming from “special interests—be they commercial, political, or religious,” this proposition holds no merit. 127 Cong. Rec. 13145 (June 22, 1981) (remarks of Rep. Gonzalez) (emphasis added). Political ads run directly counter to Congress’s interest in barring political interest groups (and their advertising dollars) from affecting programming decisions. There was no similar concern by Congress regarding advertisements by non-profit entities. We are not entitled to simply dismiss congressional intent on this matter. See Turner II, 520 U.S. at 196, 117 S.Ct. 1174 (“[D]eference must be accorded to [congressional] findings as to the harm to be avoided and to the remedial measures adopted for that end, lest [the courts] infringe on traditional legislative authority to make predictive judgments when enacting nationwide regulatory policy.”).
Moreover, the government has produced evidence that political advertising presents a greater harm to public broadcasting than non-profit advertising. As described above, non-profit announcements on public broadcasts are virtually negligible, and could easily be swamped by the very large market for political advertising. Congress could have reasonably feared the corrosive impact of advertising in general, but viewed non-profit advertisements as harmless to the public interest mission of public broadcasting.[8] In addition, while Con *897 gress has long sought to shield public broadcasting from political influences, there is no evidence that Congress has viewed non-profit entities as a harmful outside influence. As Ozier’s declaration makes clear, the content and quantity of non-profit advertising do not pose the same sort of threat to public broadcasting’s financial model as other sorts of advertisements.[9]
III.
Finally, Judge Bea errs in his narrow view of what evidence we may consider when determining the constitutionality of § 399b. In my view, Judge Bea misreads Turner II to conclude that the government must prove its case by presenting “ ‘[substantial evidence^]’ [which] must include ‘substantial evidence in the record before Congress’ at the time of the statute’s en-action.” Op. at 880 (quoting Turner II, 520 U.S. at 211, 117 S.Ct. 1174) (internal citation omitted). I disagree with Judge Bea’s view that we may not consider evidence supporting the constitutionality of § 399b(a)(2) and (3) unless some of that evidence was present in the record before Congress at the time of the statute’s enactment.
The Constitution imposes only two procedural requirements that Congress must follow in enacting laws: bicameralism and presentment. In INS v. Chadha, 462 U.S. 919, 951, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983), the Court explained: “It emerges clearly that the prescription for legislative action in Art. I, §§ 1, 7 represents the Framers’ decision that the legislative power of the Federal government can be exercised in accord with a single, finely wrought and exhaustively considered, procedure.” See also Sable Comm’ns of California, Inc. v. F.C.C., 492 U.S. 115, 133, 109 S.Ct. 2829, 106 L.Ed.2d 93 (1989) (Scalia, J., concurring) (“Neither due process nor the First Amendment requires legislation to be supported by committee reports, floor debates, or even consideration, but only by a vote.”). Judge Bea’s conclusion that the constitutionality of a federal law might turn on the quantity and quality of evidence before Congress at the time of enactment violates this fundamental principle by effectively imposing a procedural requirement on Congress’s legislative process.
Judge Bea acknowledges that there is no requirement of a “particular type of evidence in the record before Congress,” Op. at 884, and rightly declines Minority’s request to weigh the “quality of the evidence” before Congress, id. at 884. Yet Judge Bea repeatedly characterizes the government’s burden as requiring a showing of “ ‘[substantial evidence^]' [which] must include ‘substantial evidence in the record before Congress’ at the time of the statute’s enaction” to support § 399b. See Op. at 881; see also Op. at 883, 884, 885, 886.
Judge Bea’s characterization misrepresents one sentence from Turner II. In *898 reading the Turner cases together, it is apparent that the Supreme Court did not intend for lower courts to be restricted to the record before Congress, as an antecedent and necessary prerequisite to the consideration of other evidence, in assessing the constitutionality of federal laws. In Turner I, the Court expressly recognized that the parties might introduce additional evidence on remand that was not contained in the record before Congress at the time of the challenged law’s enactment. In remanding the case for further factual development, the Court stated that “[w]ithout a more substantial elaboration in the District Court of the predictive or historical evidence upon which Congress relied, or the introduction of some additional evidence ... we cannot determine whether the threat to broadcast television is real enough to overcome the challenge to the provisions made by these appellants.” Id. at 667, 114 S.Ct. 2445 (emphasis added). Three years later, in Turner II, the Court considered evidence that was not contained in the record before Congress at the time of the challenged law’s enactment. See generally Turner II, 520 U.S. at 200-12, 117 S.Ct. 1174 (repeatedly referencing expert declarations that were not part of the congressional record at the time of the challenged law’s passage). In outlining its task, the Court explained, “[w]e examine first the evidence before Congress and then the further evidence presented to the District Court on remand to supplement the congressional determination.” Id. at 196, 117 S.Ct. 1174 (emphasis added).
Thus, I read the Turner cases as identifying two sources of evidence upon which a court may rely in assessing the constitutionality of a federal law: the record before Congress at the time of enactment, and additional evidence presented in the district court. To the extent that a district court considers evidence in the record before Congress at the time of enactment, it must defer to Congress’s reasonable judgments. Accordingly, the Court explained that for purposes of considering evidence from the congressional record, “[t]he question is not whether Congress, as an objective matter, was correct to determine [that the challenged law] was necessary to [further the government’s interest]. Rather, the question is whether the legislative conclusion was reasonable and supported by substantial evidence in the record before Congress.” 520 U.S. at 211, 117 S.Ct. 1174. I do not interpret this sentence to mean that courts must locate evidence in the r,ecord before Congress at the time of the statute’s enactment which supports Congress’s legislative determination before it may consider additional evidence regarding the statute’s constitutionality. I could not uncover any case in which a court took this extreme approach, and I would not do so here.
Judge Bea’s contention that his reading of Turner II imposes a substantive rather than a procedural requirement on the legislative process, Op. at 887-88, n. 10, does not alter my conclusion. His approach imposes a procedural requirement to the passage of a constitutional statute. Otherwise stated, Judge Bea’s analysis permits the constitutionality of a statute to rest on Congress’s attention to creating a sufficiently detailed record prior to the statute’s enactment, rather than on the practical force and effect of the statute at the time it is challenged. I do not believe this additional requirement finds support in the Constitution. See Chadha, 462 U.S. at 951, 103 S.Ct. 2764.
IV.
For the foregoing reasons, I would affirm the district court’s order granting the FCC’s motion for summary judgment and *899 denying Minority’s motion for summary judgment.

. I concur, however, in the Memorandum disposition filed simultaneously with this opinion.

. It is important to distinguish the broadcast-specific version of intermediate scrutiny from other scrutiny standards that are used in First Amendment cases. Parts of Judge Bea’s opinion inappropriately follow the intermedi *893 ate scrutiny framework that the Supreme Court applied in Turner I and Turner II. The standard outlined in the Turner cases—which involved First Amendment challenges to content-neutral, non-broadcast regulations—is not relevant here. In light of the unique nature of broadcast speech, for almost eighty years the Supreme Court has refused to apply the same level of First Amendment scrutiny to broadcast regulations that it has applied to regulations governing, for example, newspapers or magazines. See League of Women Voters, 468 U.S. at 376-77, 104 S.Ct. 3106 ("Were a similar ban ... applied to newspapers and magazines, we would not hesitate to strike it down as violative of the First Amendment.”); see also National Broad. Co. v. U.S., 319 U.S. 190, 226-27, 63 S.Ct. 997, 87 L.Ed. 1344 (1943); Columbia Broad. Sys., Inc. v. Democratic Nat. Comm., 412 U.S. 94, 101, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973); F.C.C. v. Pacifica Foundation, 438 U.S. 726, 748, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978). Because § 399b is a content-based regulation of broadcast media, the intermediate broadcast scrutiny test from League of Women Voters provides the correct framework for evaluating Minority's First Amendment challenge to § 399b(a)(2) and (3). Because Discovery Network, Turner I, and Turner II involved non-broadcast regulations, I do not share Judge Bea’s view that these cases provide "additional elaboration” of the standard outlined in League of Women Voters. Op. at 877; see also Op. at 879-81.

. There are two key differences between strict scrutiny and intermediate broadcast scrutiny. First, the government interest need only be "substantial,” rather than "compelling,” to survive intermediate broadcast scrutiny. Second, the "narrowly tailored” requirement of intermediate broadcast scrutiny is more flexible than the corresponding requirement for strict scrutiny. Determining the exact meaning of "narrowly tailored” is a difficult exercise because the Supreme Court has not explicitly defined this term in its broadcast cases.

. I understand Judge Bea’s argument to be that he defers to Congress's judgment that market pressure poses a danger to public broadcasting, yet he draws a distinction between the type of market pressure which for-profit and political or public issue advertisers will exert. Op. at 884-85, 885-86. Such a distinction is untenable in light of the tremendous sums spent on political campaign advertisements—$2.2 billion in 2008—which represent a considerable source of potential revenue by any measure. Judge Bea reaches his conclusion that § 399b is overinclusive only by discounting this evidence. See Op. at 885-86.

. WGBH is the largest producer of primetime and online programming for the Public Broadcasting Service (PBS) and is also a major producer of national programs for many public radio stations.

. I believe that this evidence belies Judge Bea's glib contention that "there is no reason to think that public issue and political advertisers have any greater propensity to seek large audiences than do nonprofit advertisers.” Op. at 888.

. Judge Bea’s approach also flatly contradicts later commercial speech cases. See, e.g., Greater New Orleans Broad. Ass’n, Inc. v. United States, 527 U.S. 173, 188, 119 S.Ct. 1923, 144 L.Ed.2d 161 (1999) ("The Government is not required to employ the least restrictive means conceivable.”); see also ¿¿.(stating that narrow tailoring requires "a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is in proportion to the interest served”) (quoting Board of Trustees of State Univ. of N.Y. v. Fox, 492 U.S. 469, 480, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989)).

. It bears repeating that $2.2 billion represents a large market by any measure. Moreover, Judge Bea’s analysis of the potential effects of political advertising on the "nature and prevalence” of public television’s unique programming, Op. at 885, examines only one side of the coin. While he may be correct that a political candidate cartoon is a laughable prospect, Congress could well have feared that market pressures would entice public television stations to limit children’s and oth *897 er educational programming in favor of more lucrative advertising. Indeed, as Judge Bea acknowledges, "[e]specially in an election season, we see how a news broadcaster may be tempted to alter the content of its public affairs programming if it thinks it can garner additional advertising dollars from one or another campaign, SuperPAC, or advocacy group by doing so.” Op. at 886. In light of the record evidence supporting such a conclusion, I find Congress’s determination infinitely reasonable.

. Specifically, Ozier explains in his declaration that "WGBH, like other noncommercial educational stations, currently accepts announcements from not-for-profit entities ... These announcements do not present the same danger to public television’s other funding sources, or its cost structure, as would for-profit advertising ...”